IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 29657-1-III |
| Respondent and | ) | (consolidated with Nos. |
| Cross Appellant, | ) | 29679-2-III, 29691-1-III) |
| | ) | |
| v. | ) | |
| | ) | |
| RICARDO JUAREZ DELEON, | ) | |
| | ) | |
| Appellant and | ) | |
| Cross Respondent, | ) | |
| | ) | |
| and OCTAVIO ROBLEDO, | ) | OPINION PUBLISHED IN PART |
| and ANTHONY DELEON, | ) | |
| | ) | |
| Appellants. | ) | |

SIDDOWAY, C.J. — Ricardo Juarez DeLeon, Octavio Robledo, and Anthony

DeLeon appeal their convictions and aggravated exceptional sentences arising from a

gang-related shooting at a home in Sunnyside and a high speed chase thereafter, in which

Anthony DeLeon attempted to elude responding officers. Over a dozen issues are raised

by one or more of the appellants in these consolidated appeals, many involving the

admission at trial of gang evidence.

We conclude that gang information that the three were required to give to Sunnyside

jail officers at booking as a condition of receiving safe housing was not a voluntary

statement for purposes of the Fifth Amendment and should not have been admitted at trial,

but that its admission was harmless except as to the gang aggravator that the jury found against Ricardo DeLeon. In the published portion of this opinion, we find additional errors in the admission of gang evidence but conclude that they were harmless, conclude that sufficient evidence supported the jury's verdicts on the gang aggravator, and find no abuse of discretion by the trial court in denying a motion for a new trial based on a juror's misconduct in communicating to Twitter[1] followers during trial and deliberations.

In the unpublished portion of the opinion, we reject the appellants' claims of ineffective assistance of counsel, instructional error, and the dozens of issues raised in the appellants' pro se statements of additional grounds.

We reverse the exceptional sentence imposed on Ricardo DeLeon based on the gang aggravator and remand for further proceedings. We otherwise affirm.

## FACTS AND PROCEDURAL BACKGROUND

At around 11 p.m. on May 9, 2009, Ignacio Cardenas and Miguel Acevedo were standing on the sidewalk outside Mr. Cardenas's residence in Sunnyside waiting for Mr. Cardenas's two cousins and a friend, Jose Barajas, who were coming to the home to bring them passes to a quinceañera. Acevedo and Cardenas were both members of the Lower

---

[1] Twitter is a real-time information network that lets people share and discuss what is happening at a particular moment in time through the use of "tweets." The service allows users either to send direct messages to specific individuals or to use "twitter posts" accessible to the public. The process of posting messages on Twitter is commonly referred to as "tweeting." *See* http://twitter.com/about.

Valley Lokotes "LVL" gang, which claims the color blue. The Cardenas home was a known LVL hangout. Seeing what he thought were friends in a passing Taurus automobile, Mr. Acevedo flashed a "friendly" LVL sign. He was mistaken; the occupants of the Taurus were not his friends. The driver of the car made a U-turn and one of the occupants yelled something to the effect that they would shoot.

The car passed the home, made a second U-turn, slowed down, and gunfire erupted from the passenger side. Mr. Acevedo ducked behind the tire of a parked car. His and Mr. Cardenas's friend, Angelo Lopez, who had just emerged from the house and was coming down the steps when the gunfire started, "hit the ground." Report of Proceedings (RP) at 1353. Mr. Cardenas sustained a near-fatal bullet wound to the abdomen and ultimately lost a kidney. It was dark outside and none of the three men could identify the persons inside the car.

Jose Barajas had just reached the Cardenas residence in his truck with passengers Monica Mendoza and Griselda Mendoza when the shooting started. Monica[2] saw people inside the Taurus wearing red bandannas over their faces but could not identify them at that time. Griselda also noticed that someone in the Taurus was wearing red. Monica estimated that nine gunshots were fired from the front passenger side.

---

[2] We use the Mendoza sisters' and the DeLeon brothers' first names in those contexts where a reference to "Ms. Mendoza" or "Mr. DeLeon" would not be clear from the context. We intend no disrespect.

3

Mr. Barajas followed the Taurus as it fled the area. He temporarily lost sight of it in a housing development, but saw it again near the intersection of Allen Road and Mabton-Sunnyside Highway. There, all three truck occupants saw someone in the Taurus point a gun at them. Monica no longer saw the red bandannas and was able, this time, to identify two of the car's occupants—Anthony DeLeon (a friend of her baby's father, known to her as "Monkey") and Octavio Robledo, whom she knew from school. Everyone in the Barajas truck was certain this was the same Taurus that was involved in the shooting at the Cardenas home.

Mr. Barajas called 911 on his cell phone and reported he was following a silver Taurus that had been involved in a shooting. He chased the car onto Interstate 82. Sunnyside Police Officer Skip Lemmon joined the pursuit, as did several Grandview and Prosser police officers. At one point, Officer Lemmon observed an object that he thought might be a gun fly by the mirror on the passenger side of his car. Later in the chase, Prosser Police Officer Shane Hellyer observed one of the Taurus passengers throw an object out the window that sparked when it hit a bridge railing over the Yakima River, although no evidence was found in a later search of the rough and rocky terrain in that area. After a several-mile chase at speeds reaching 110 mph, the Taurus was finally stopped by spike strips. Its occupants—driver Anthony DeLeon, front seat passenger Octavio Robledo, and rear passenger Ricardo DeLeon, were arrested.

4

Ricardo DeLeon gave Sunnyside police detectives permission to search his Taurus automobile. Officers seized a red cooler, two Budweiser beer cans, two red bandannas, a pair of red dice, a digital scale, a bong, a plastic bag of marijuana inside a beer can, and a cell phone with Anthony DeLeon's name on the wallpaper.

The three suspects were taken to the Sunnyside police station where Detective Jose Ortiz administered *Miranda*[3] warnings: first to Ricardo DeLeon at 2:30 a.m. on the morning of May 10; to Anthony DeLeon several hours later, at 7:03 a.m.; and to Octavio Robledo at 7:42 a.m. Each waived their rights and agreed to answer questions. All denied any involvement in the shooting at the Cardenas home.

All three defendants were ultimately charged by amended information with three counts of first degree assault while armed with a firearm and, as a sentencing aggravator, with intent to benefit a criminal street gang. Anthony DeLeon was additionally charged with attempting to elude a pursuing police vehicle.

Considerable time was devoted before trial to the State's wish to offer evidence of the defendants' alleged affiliation with the Norteño gang and evidence of gang culture, including expert testimony from Detective Ortiz of the Sunnyside Police Department, to show that the shooting was gang motivated. The defendants raised multiple objections to the State's introduction of such evidence. The court ultimately admitted evidence of the

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

defendants' alleged affiliation with the Norteños, including to allow Detective Ortiz to testify as an expert on gang culture, over a standing defense objection. The court explicitly cautioned that the detective's expert testimony would be prejudicial and must be "carefully crafted" to avoid the impression that the defendants "must have done [the crime] because that's what the culture mandates." RP at 581.

The defendants' theory of the case was misidentification. They suggested it was someone else's car from which the gunshots were fired and they were never at the Cardenas residence on the night of the shooting. They pointed to the fact that Mr. Barajas and the Mendoza sisters temporarily lost sight of the perpetrators' car during the chase, that Mr. Barajas had not been certain of the Taurus's color, that no guns or ammunition were found in the car or in the areas where police theorized guns had been discarded, and that the State failed to test any of the defendants' hands for gunshot residue. Although none of the defendants testified at trial, they asserted through other witnesses and argument that they had been drinking all day at a barbecue and were dropping Anthony off at his girl friend's residence when they randomly met up with the Barajas truck, whose occupants mistook Anthony's Taurus for the car involved in the shooting. They claimed they were intoxicated and only fled the police because there was marijuana and drug paraphernalia in their car. The defense also insinuated that the May 9 shooting was retaliation by an individual from a Sureño sect, the (VGLs).

6

The court denied a defense request to bifurcate trial of the gang aggravator and refused the defendants' proposed lesser included instruction for drive-by shooting. Although it denied defense motions to exclude all of the defendants' recorded statements and booking forms as testimonial hearsay of nontestifying defendants, it instructed the jury that it could consider a given defendant's out-of-court statements "as evidence against that defendant, but not as evidence against another defendant." Robledo Clerk's Papers (CP) at 188. Over defense objection, the court also gave the following instruction on transferred intent:

> If a person acts with intent to assault another, but assaults a third person, the actor is deemed to have acted with intent to assault the third person. The unintended victims do not need to be physically injured and the defendant need not know of their presence[.]

Anthony DeLeon CP at 627.

At the close of the State's case, the court denied defense motions to dismiss the assault counts and gang aggravators for insufficient evidence. It also denied a motion by Anthony DeLeon to dismiss the eluding charge based upon improper venue as untimely or waived.

At the end of jury deliberations but before the verdict was delivered to the court and read, it came to light that a juror had been communicating on Twitter about his views of the justice system and the progress of the trial. A printout of the juror's Twitter communications ("tweets") was made part of the record. After reviewing the content of

the tweets, defense counsel and the prosecutor all agreed there was no need to interview

the juror. No one moved for a mistrial at that time.

The jury returned a verdict finding all three defendants guilty as charged on all

counts. By special verdicts, the jury also found firearm enhancements for each crime and

that the defendants' crimes were committed with intent to benefit a criminal street gang.

Mr. Robledo and Ricardo DeLeon moved for a new trial on several grounds,

including juror misconduct for the Twitter communications that Detective Ortiz's

testimony grossly exceeded the court's ER 404(b) ruling and prejudiced their right to a

fair trial, and that the guilty verdicts and gang aggravator findings were not supported by

the evidence. The court denied the motion.

The court imposed aggravated exceptional sentences for each defendant. All

timely appealed.[4]

## ANALYSIS

All three appellants contend on multiple grounds that improperly admitted gang

evidence prejudiced their right to a fair trial and resulted in unlawful exceptional

---

[4] The State filed a cross appeal from Ricardo DeLeon's sentence. The court granted him an exceptional sentence below the base standard range on count 1 only, on the bases that his offender score was based largely on juvenile offenses that occurred 15 to 20 years earlier, and that he had a number of minor traffic violations that are now decriminalized. The court deemed a downward departure on count 1 a more equitable treatment for this defendant relative to his codefendants' sentences. The State has submitted no briefing on its cross appeal and has thus apparently abandoned it.

sentences. All contend that the jury's findings of a gang aggravator, on which the court based their exceptional sentences, were not supported by the evidence.

Defendants Ricardo DeLeon and Octavio Robledo additionally challenge the trial court's denial of their motion for mistrial.

Anthony DeLeon raises a constitutional challenge to the trial court's instruction on transferred intent and raises several claims of ineffective assistance of counsel.

We first address the defendants' several objections to the admission and use of gang evidence and their challenges to the sufficiency of evidence to support the finding of that gang aggravator. We next turn to the additional issues raised by Ricardo DeLeon and Octavio Robledo, turn thereafter to the additional issues raised by Anthony DeLeon, and conclude by addressing issues raised by the defendants' statements of additional grounds.

### I. Gang Evidence Issues

The most concerning issues raised on appeal arise from several types of evidence offered by the State to prove that the three defendants were associated with the Norteño gang and that the shooting was committed with the intent to cause a benefit or advantage to a criminal street gang. Some was of dubious relevance and there is a danger that stronger evidence against defendants Octavio Robledo and Anthony DeLeon, neither of whom testified, might have influenced the jury's finding that the gang aggravator applied

to Ricardo DeLeon. For ease in following the gang evidence-related issues on appeal, we start with a summary of the evidence against each defendant.

None of the defendants challenge the admission of testimony from Miguel Acevedo that he flashed an LVL sign and believed that it was his flashing the sign that triggered the assault. Although there was conflicting evidence, none challenge the admission of testimony of Monica Mendoza that she saw that the occupants of the Taurus, from which shots were fired, were wearing red bandanas on their faces; the testimony of Monica, her sister, and Mr. Barajas that they were confident that the Taurus that they saw entering the freeway was the same Taurus from which the shots were fired; or the testimony of Monica that when she and the others sighted the Taurus a second time at the Sunnyside-Mabton Road intersection, she recognized Anthony DeLeon and Octavio Robledo as two of the passengers.

The State's strongest evidence of the defendants' gang membership was arguably its evidence against Octavio Robledo, the front seat passenger in the Taurus. Monica testified that she had known him to be a Norteño associate in school. He admitted to Detective Ortiz following *Miranda* warnings that he was North Side Varrio, a Norteño gang. At the time of his arrest, he was wearing a red cloth belt with a star on the buckle, and white Nike shoes with a red "swoosh." He repeated during booking that he was North Side Varrio and that his moniker is "Fat Boy." Booking records noted the following tattoos: "F" on his right forearm, "B" on his left forearm, "N" on his neck and

10

"14" on his back. Testimony at trial established that the numbers 1, 4, and 14 are significant to Norteños because "N" is the 14th letter in the alphabet. By the time of trial, Mr. Robledo had an additional tattoo on his hand of a Huelga bird with "Warrior" on top of it, which Detective Ortiz testified was also a symbol of Norteño gang affiliation. A photograph of his hand revealed the Huelga bird and additional tattoos: four dots—one on each finger; the initials "NSV" on his ring finger, and the numerals "XIV" near the web of his thumb and finger.

Perhaps equally strong was the State's evidence that Anthony DeLeon, who was driving the Taurus, was a member of Earlimart, a Norteño gang. Monica testified that she had known him, too, to be a member of the Norteños. At the time of his arrest, he was wearing a black cloth belt with a buckle displaying a capital "N." His black Nike shoes had red stars on one inside sole. The cell phone found during a search of the Taurus, which included his name on the wallpaper, included photos depicting a person in red clothing and a red cap with a black "N" symbol urinating on "Scrapz" (a derogatory name for Sureño gang members), a Huelga bird in the color black with a red background, the slogan "Norte SK X-4," and the word "Familia" (meaning "family" in Spanish), all of which Detective Ortiz explained as symbols of gang affiliation. Also stored in the cell phone were songs whose titles and artists (though not lyrics) were admitted into evidence and suggested association with the Norteños: "Del Norte" by Los Tigres; "Northern Expozure" and "Still Mob Livin" by Woodie; "Northern Pride" by Big Tone, "Norteños"

11

by Northern Warriorz, and "Darkroom Familia" by Woodie. When asked about his gang involvement by Detective Ortiz, Anthony initially mentioned XIV, but then told the detective he was Earlimart—both Norteño-affiliated gangs. Additional evidence included his self-report at booking that his moniker was Monkey and that he was formerly a Norteño and should not be housed with Sureños. The booking officer noted that he had the following tattoos, which Detective Ortiz testified were gang related: four dots on the left forearm, the number 1 on his left leg, and the number 4 on his right leg.

The State's weakest evidence of a current gang affiliation was against Ricardo DeLeon, Anthony's older brother and the back seat passenger. When questioned by Detective Ortiz following the defendants' arrest, Ricardo denied any gang affiliation. When arrested, he was wearing a pair of red and black sandals with star insignias and a red T-shirt depicting a recently deceased Norteño gang member Julian Flores. One of the two red bandannas found in the car was found in the back seat. A gang disclosure form on Ricardo, completed when he was booked, reflected in his report that he was formerly a Norteño and should not be housed with Sureños; he did not claim to have a moniker. His only tattoo—a cross with two dots on his right forearm—was not gang related.[5]

---

[5] In the CrR 3.5 hearing, Detective Ortiz described Ricardo DeLeon's tattoo as a Pachuco cross, popular in the 1940s with a group of Catholic Hispanic Latinos located in California. Supplemental Report of Proceedings (RP) (Sept. 28, 2010) at 15-16. The detective testified that by itself, it was not a common or normal gang indicator. *Id.* at 17.

*A. ER 404(b) Issues*

The appellants raise three issues relating to the trial court's admission of evidence of their gang affiliation under ER 404(b), which provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, but may be admissible for other purposes, such as proof of motive, intent, or identity.

Gang evidence falls within the scope of ER 404(b). *State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009). Only Anthony DeLeon broadly challenges the trial court's original ruling admitting gang evidence. Mr. Robledo challenges only the trial court's decision to admit the expert testimony of Detective Ortiz that the Huelga tattoo on his hand signified that he had committed a very serious crime. Ricardo DeLeon challenges the trial court's denial of his motion for mistrial, raised after he alleges the State exceeded the court's limitations imposed on gang evidence and the bounds of ER 404(b). After some preliminary discussion of the evidence rule, we address the challenges in that order.

"ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

13

ER 404(b) must be read in conjunction with ER 403, which "requires exclusion of evidence, *even if relevant*, if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Smith*, 106 Wn.2d 772, 775-76, 725 P.2d 951 (1986). We consider gang evidence prejudicial due to its general "inflammatory nature." *State v. Asaeli*, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009). Generalized expert testimony on gang culture is a particular concern, for, "absent (1) evidence showing adherence by the defendant or the defendant's alleged gang to those behaviors and (2) a finding that the evidence relating to gangs is relevant to prove the elements of the charged crime, [it] serves no purpose but to allow the State to 'suggest[ ] that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged.'" *State v. Mee*, 168 Wn. App. 144, 159, 275 P.3d 1192 (2012) (second alteration in original) (quoting *Foxhoven*, 161 Wn.2d at 175). Accordingly, to admit gang affiliation evidence there must be a nexus between the crime and gang membership. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009) (citing *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995)); *cf. State v. Bluehorse*, 159 Wn. App. 410, 429-30, 248 P.3d 537 (2011) (applying the nexus requirement to evidence offered to prove a gang aggravator in support of an exceptional sentence).

The analysis by which courts limit evidence of other crimes, wrongs, or acts to proper purposes is well settled: before admitting the evidence, the trial court must "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify

14

the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." *Yarbrough*, 151 Wn. App. at 81-82. The balancing of these interests must be conducted on the record. *State v. Kilgore*, 147 Wn.2d 288, 292, 53 P.3d 974 (2002). The court's decision on admission of ER 404(b) evidence is reviewed for abuse of discretion. *Foxhoven*, 161 Wn.2d at 174.

> *1. Anthony DeLeon's challenge to pretrial ruling that gang evidence would be admissible*

Anthony DeLeon argues that all of the evidence relating to the defendants' current or former gang affiliation violated ER 404(b). He argues that the evidence did not have a proper purpose, because "[m]otive is not an element of the charged offenses." Br. of Appellant Anthony DeLeon at 20. He contends that evidence of the defendants' gang affiliation merely suggested that he and his codefendants were criminal types who would likely commit the crimes charged, and was unduly prejudicial.

Here, the trial court found on the record that the gang evidence was relevant to the issue of motive, which is a permitted purpose for offering evidence of gang affiliation under ER 404(b). *See Yarbrough*, 151 Wn. App. at 81 (gang evidence admissible as to motive and state of mind); *State v. Boot*, 89 Wn. App. 780, 788-90, 950 P.2d 964 (1998) (admissible as to motive, premeditation); *State v. Campbell*, 78 Wn. App. at 821 (premeditation, motive, and intent). "Motive is an inducement which tempts a mind to

15

commit a crime," and, although it is not an element of the offense that the State is required to prove, evidence showing motive may be admissible. *Boot*, 89 Wn. App. at 789. Where the existence of a motive on the part of a defendant has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence, motive is relevant. ER 401; *Mee*, 168 Wn. App. at 157.

The State's theory was that the defendants were Norteño gang members or associates who drove to a Sureño neighborhood and a well-known Sureño-associated house for the purpose of spotting and shooting a rival gang member. Evidence that the Cardenas house was Sureño-associated, that Mr. Acevedo threw an LVL sign that apparently triggered the violence, and that Monica Mendoza observed red bandannas on the faces of the occupants of the Taurus from which shots were fired, all suggested that the crime was gang related. Evidence that the defendants were members or associates of a rival gang claiming the color red made it more probable they were involved than if they were not gang affiliated. Generally speaking, the trial court did not abuse its discretion in ruling that gang evidence would be admissible so long as it was tied to gang affiliation and motive.

> 2. *Octavio Robledo's challenge to pretrial*
> *ruling that evidence relating to his Huelga*
> *bird tattoo would be admissible*

Mr. Robledo specifically challenges the admission under ER 404(b) of the State's evidence of a tattoo of a Huelga bird on his hand. In making its pretrial offer of proof, the State argued that its purpose for offering a photograph of the tattoo was, like its purpose for offering evidence of the defendants' clothing and their other tattoos, to demonstrate that the defendants' chosen dress and tattoos were evidence of Norteño affiliation, and thereby evidence of motive.

Consistent with the State's offer of proof, both Sergeant Jeff Cunningham and Detective Ortiz tied Mr. Robledo's tattoo, like the other tattoos and the defendants' clothing, to Norteño gang allegiance. Sergeant Cunningham testified that the Huelga bird is a symbol adopted by the Norteños and Detective Ortiz confirmed the symbol as one of gang allegiance.

Detective Ortiz went beyond that, however, and answered questions about the *meaning and significance* of the Huelga bird, telling the jury that, in the penitentiary, [the Huelga bird] signifies a "keeper of knowledge," while on the streets "it'll be that some individual has done a very serious crime, particular drive-bys or a homicide." RP at 1955.

At his earliest opportunity, Anthony DeLeon moved for a mistrial on two bases, one being that the detective's testimony as to the meaning of the Huelga bird implied that he— having a picture of a Huelga bird on a cell phone—was a major player in the gang and had

17

committed a prior homicide or drive-by. Mr. Robledo joined in the motion, arguing that

"[to] say, well, it's evidence that he committed a homicide or a high level assault, it has,

it's gone way beyond evidence needed to prove motive in this case." RP at 1994.

Mr. Robledo assigns error to the trial court's ER 404(b) ruling, arguing that the

court failed to engage in an ER 404(b) analysis by failing to consider whether Mr.

Robledo *had* committed a very serious crime, whether the serious crime he had

committed was relevant, and whether evidence concerning the prior crime was unduly

prejudicial. In fairness to the trial court, that was not the State's stated purpose for the

evidence, as to which it originally ruled.

Nonetheless, once the mistrial motion highlighted the detective's testimony about

the symbol's meaning, the trial court explained why it viewed the detective's evidence as

admissible for a broader purpose, continuing to justify the admission on ER 404(b)

grounds. Its ruling thereby presents an issue that we analyze in the first instance under

ER 404(b). The court explained:

> The State has presented—or provided an expert who has described
> what the various symbols mean, what the colors mean, and has given
> meaning to the evidence. I can't find—it may be information that is in this
> setting considered negative or prejudicial to the Defendants. Outside this
> criminal setting where we are today, I gather that it was not considered a
> negative, it was considered a positive.
> But in any event, it's what they created in the form of tattoos and
> what they display either through clothing or the tattoos. And I think it's
> appropriate.

RP at 1997. Following an interjection by the prosecutor, the court continued,

18

> [S]o what has come in is evidence that was provided by them and the function of the expert testimony was to give that evidence that came in meaning and that has happened.
> . . . I'm denying it. I think that there—the prejudice that it obtains is prejudice that was created by them and it's fully appropriate to the case and it should move forward.

RP at 1998.

Any time a defendant has committed a prior crime, she or he can be said to be responsible for the fact that evidence of that crime exists. The fact that Mr. Robledo was responsible for a tattoo being on his hand that allegedly telegraphed his prior crime has no place in the ER 404(b) analysis. We agree with Mr. Robledo's trial lawyer that testimony suggesting that the tattoo signified that Mr. Robledo had committed a prior homicide or drive-by shooting goes "way beyond evidence needed to prove motive."

Nonetheless, a trial court's admission of evidence on an incorrect basis does not constitute error if a proper basis exists for admitting the evidence even though that was not the basis articulated by the trial court. *State v. Butler*, 53 Wn. App. 214, 217, 766 P.2d 505 (1989) (citing *State v. Bowen*, 48 Wn. App. 187, 194, 738 P.2d 316 (1987)). There had consistently been an implication, if not an explicit assertion, of another basis for admitting the evidence. On several occasions when the parties argued the in limine issue of whether the State should be able to offer evidence of a Huelga bird tattoo on Mr. Robledo's hand, the State emphasized its position that the tattoo had not been present on Mr. Robledo's hand at the time he was arrested. At trial, it presented the testimony of

19

Sergeant Cunningham and Detective Ortiz that neither had seen the Huelga bird tattoo on his hand at the time of his arrest. In closing argument, the prosecutor told the jury

> You've seen their statements when they're booked in, XIV Norteños. They've all got gang tattoos. And, in fact, Mr. Robledo subsequently has got the one that means you've committed an act of violence after the fact of this event. Where do we know he's seated? In the front passenger seat. I guess that night he earned it.

RP at 2335. It would appear, then, that an unstated but intended purpose of the evidence was not to prove that Mr. Robledo had committed a *prior* crime, but that the tattoo was a nonverbal admission, following the shooting of Mr. Cardenas, that Mr. Robledo had recently participated in a drive-by—in other words, it was evidence of the presently-charged crime. *Cf. State v. Liverman*, 687 S.E.2d 70 (S.C. App. 2009) (State's trial theory was that two teardrop tattoos were obtained by defendant after two murders for which he was on trial; defendant failed to argue that the evidence might be construed as suggesting earlier murders, and thereby as propensity evidence, until appeal)

In any event, if Detective Ortiz's testimony about the Huelga bird's meaning exceeded a proper purpose under ER 404(b) and was otherwise inadmissible, the erroneous admission of evidence "requires reversal only if the error, within reasonable probability, materially affected the outcome of the trial." *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). The State never suggested that the jury should infer prior criminal activity from the Huelga bird tattoo. The jury was instructed to consider gang evidence solely for the purpose of establishing a motive as to why the crime charged was committed.

20

We presume the jury followed this instruction. *See State v. Swan*, 114 Wn.2d 613, 662, 790 P.2d 610 (1990). If any error occurred, it was harmless.

### 3. *Ricardo DeLeon's challenge to denial of the motion for mistrial*

During a break in Detective Ortiz's examination, the three defendants jointly moved for a mistrial on grounds that the State's gang evidence had far exceeded the court's announced limitations and the bounds of ER 404(b). Ricardo DeLeon's lawyer conceded that some evidence of gang affiliation to establish motive had been properly admitted, but argued that "the State has sought to either ignore or evade [the] Court's ruling and introduce evidence of gang affiliation at every opportunity." RP at 1993. He argued that the prejudice was greatest for Ricardo, given the "scant evidence" that he was a gang affiliate or member. *Id.* The State denied that it had exceeded the trial court's ruling on the parties' in limine motions. The court denied the motion, stating, among other reasons, that "the function of the expert testimony was to give that evidence that came in meaning and that has happened." RP at 1998.

We review the trial court's denial of a motion for a mistrial for abuse of discretion. *State v. Rodriguez*, 146 Wn.2d 260, 269, 45 P.3d 541 (2002). An abuse of discretion occurs when "no reasonable judge would have reached the same conclusion." *Id.* A court also abuses its discretion when its decision is based on untenable grounds or untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

21

The trial court's decision to deny a motion for a mistrial will be overturned only when there is a "substantial likelihood" the prejudice affected the jury's verdict. *Rodriguez*, 146 Wn.2d at 269-70.

Ricardo DeLeon is correct that Detective Ortiz's discussion of "courtship" (how a person becomes a gang member either through being "jumped in" or through family ties) was not relevant to motive in this case. Gang initiation, or how to become a new member, was not at issue given the State's theory that all three defendants were already gang affiliates acting in concert to promote gang interests. Similarly, during testimony about Norteño and Sureño gang hierarchy, Detective Ortiz testified that a local Sureño member who is an inmate at the Walla Walla Penitentiary is "calling the shots" and giving marching orders to "soldiers" or gang members on the street. RP at 1927-30. This testimony had no relevance to motive when the State was not alleging that the shooting was ordered by anyone within the hierarchy. Likewise, Detective Ortiz's extended discussion about the number, variety, and names of local gangs not tied to this incident had little relevance and could prejudicially suggest a pervasiveness of dangerous criminal street gangs in the area. Finally, Detective Ortiz's testimony that gangs use the Internet for intimidating and threatening rivals "except for pulling the trigger, so to speak," was also irrelevant when there was no evidence connecting Internet activity to the May 9 shooting. RP at 1940.

22

On the other hand, Detective Ortiz's testimony about "putting in work" and the expectation that gang members are in it for life were relevant to the State's theory that the defendants were in fact gang affiliated despite defense claims that they were no longer active, and that the shooting was in retaliation for disrespect by a rival gang. Detective Ortiz's testimony about subsets of the Norteños gang in the area and their rivalry with Sureño subsets such as the LVLs was relevant, since the asserted motive for the crime was tied to that rivalry.

Nevertheless, the irrelevant generalized evidence had little or no probative value. It could suggest to the jury the "forbidden inference" underlying ER 404(b) that the defendants were part of a pervasive gang problem and were criminal-types with a propensity to commit the crimes charged. *Mee*, 168 Wn. App. at 159 (quoting *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999)); *see Foxhoven*, 161 Wn.2d at 175. The trial court was partially mistaken in ruling on the mistrial motion to the extent it concluded the generalized gang evidence had been appropriately limited. It had not been.

We take this opportunity to remind trial courts that ER 403 has particular importance in assessing the admissibility of generalized evidence regarding the behavior of gangs and gang members. If expert testimony on gang behavior does not both (1) show adherence by the defendant or the defendant's gang to those behaviors and (2) tend to prove the elements of the charged crime, then its relevance will not outweigh

23

the risk that the jury will draw a forbidden inference. *Mee*, 168 Wn. App. at 159. All members of this panel agree that trial courts should carefully apply ER 403 in determining the quantity and nature of gang affiliation testimony that will be admitted.

Again, however, any error in the admission of ER 404(b) evidence requires reversal only if the error, within reasonable probability, materially affected the outcome of the trial. We have already determined that evidence of the defendants' gang affiliation was properly admitted to demonstrate motive, and identify above a fair amount of the generalized gang evidence that was relevant and properly admitted. The generalized evidence that exceeded appropriate limitations was less powerful than the direct evidence of the crime and the relevant (and prejudicial, but not unduly prejudicial) gang evidence that was legitimately admitted. We see no likelihood that the additional generalized gang evidence materially affected the outcome of the trial.

> B.  *Were Postarrest Jail Booking Statements And Jail*
> *Booking Forms Voluntary Statements Under The*
> *Fifth Amendment?*

Before trial, the State provided notice of its intention to offer as evidence gang documentation forms completed at the Sunnyside jail with information provided by the defendants. At the CrR 3.5 hearing on admissibility, Jail Officer Gabino Saenz testified that when the defendants were released to him for booking, procedure required that he ask them if there was anyone they could not be housed with. If an individual responds that he cannot be housed with Sureños, for example, as these defendants did, then Officer

24

Saenz uses the Sunnyside jail's Gang Documentation Form to obtain information about the individual's gang affiliation and colors and numbers claimed. The Gang Documentation Form is completed even if the individual states that he is no longer active in a gang, and both DeLeon brothers claimed to be inactive. Each defendant signed his Gang Documentation Form under penalty of perjury, at Officer Saenz's request.

All defendants challenge the admission into evidence of the gang documentation forms. They argue that the procedure for obtaining the information presented them with the prospect of being housed with members of a rival gang, and implicitly promised to protect them from that danger if they provided information about their gang affiliation. They argue that this "conditional" opportunity for protection from violence coerced them into making self-incriminating statements.

The State's pretrial motions in limine asked the court to admit the gang documentation forms on one of two rationales: either because the forms provided answers to routine booking questions that do not require that the defendant be advised of his *Miranda* rights, or because *Miranda* warnings given by Detective Ortiz hours earlier were still fresh.

We turn first to the "routine booking question" rationale—not because it is dispositive, but because it might otherwise confuse the real issue on appeal. To determine whether the administration of *Miranda* warnings is required turns on whether any part of the questioning of a defendant is: (a) custodial, (b) interrogation, (c) by an

25

agent of the State. *State v. Sargent*, 111 Wn.2d 641, 649-52, 762 P.2d 1127 (1988)

(citing *Miranda*, 384 U.S. at 444). "Interrogation" for Fifth Amendment purposes refers

> to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 650 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed.

2d 297 (1980)). The asking of routine booking questions during the booking process

does not generally violate the prohibition against interrogation found in *Miranda* because

the questions asked rarely elicit incriminating statements. *Id.* at 651.

The trial court rejected the State's argument that Officer Saenz posed routine

booking questions that did not require administering *Miranda* warnings, but it agreed

with the State that the *Miranda* warnings administered by Detective Ortiz hours earlier

were still fresh and, implicitly, that they remained sufficient. The court explained:

> Therefore, the statements, to the extent that they would be testimonial in that sense, that they are—the gentlemen were clearly in custody in these have been coerced statements, I don't find that they are just ordinary booking questions. They may have been treated that way previously, but they are very clearly asking questions of an individual that could clearly be evidence in the future and Miranda would be necessary before they be provided.
> In any event, [*Miranda*] has been given and I'm going to—I find that they are admissible for those purposes. That doesn't address some of the other issues that may come up, but at least from a 3.5 perspective and a statement from the Defendants, they come in.

RP at 93-94.

26

The challenge to admitting the gang documentation forms that the defendants raise on appeal (and that they also argued below) differs from the two issues raised by the State's in limine motion. The defendants argue that regardless of whether the *Miranda* warnings were fresh, the information the defendants were required to provide was still involuntary, given the inherently coercive context: being presented with the choice whether to be placed in safe jail housing, or very dangerous jail housing.

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Article I, section 9 of the Washington State Constitution affords the same protection. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008); *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). To be admissible, a defendant's statement to law enforcement must pass two tests of voluntariness: (1) the due process test, whether the statement was the product of police coercion; and (2) the *Miranda* test, whether a defendant who has been informed of his rights thereafter knowingly and intelligently waived those rights before making a statement. *State v. Reuben*, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991). A confession that is the product of government coercion must be suppressed regardless of whether *Miranda* has been complied with. *United States v. Anderson*, 929 F.2d 96, 98 (2nd Cir. 1991).

Courts evaluate the totality of the circumstances to determine whether custodial statements were voluntarily given. *Unga*, 165 Wn.2d at 100 (citing *Fare v. Michael C.*,

27

442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Miranda*, 384 U.S. at 475-77). The government must prove the voluntariness of a defendant's statement by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

The defendants rely on *Payne v. Arkansas*, 356 U.S. 560, 567, 78 S. Ct. 844, 2 L. Ed. 2d 975 (1958) and *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) as examples of coercion in obtaining potentially incriminating custodial statements even though no threat of violence came from law enforcement. In *Payne*, the police chief promised to protect an accused killer from an angry mob gathered outside the jail in exchange for his confession. *Payne*, 356 U.S. at 562-64. In reversing Payne's conviction, the Supreme Court concluded:

> It seems obvious from the *totality* of this course of conduct, and particularly the culminating threat of mob violence, that the confession was coerced and did not constitute an "expression of free choice," and that its use before the jury, over petitioner's objection, deprived him of "that fundamental fairness essential to the very concept of justice," and, hence, denied him due process of law, guaranteed by the Fourteenth Amendment.

*Id.* at 567.

In *Fulminante*, a prison informer offered to protect the defendant from "credible threat of physical violence" by other inmates who suspected him of killing a young girl on the condition that the defendant tell him the truth about the killing. 499 U.S. at 286.

28

The Supreme Court concluded the resulting confession was coerced and involuntary and explained that "a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *Id.* at 287. And "'coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.'" *Id.* (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960)).

Here, the trial court characterized the statements as "coerced" in its oral ruling ("the gentlemen were clearly in custody *in these have been coerced statements*, I don't find that they are just ordinary booking questions"). RP (afternoon Sept. 28, 2010) at 93-94. But the context of this reference, the court's ultimate ruling, and a possibly flawed transcription make it unclear what the court meant. In context, it might well have meant—as the State argues—only that the statements were custodial and potentially incriminating such that the prior *Miranda* warnings given to them were necessary. We need not dwell on what the trial court meant in referring to "coercion" because we review de novo a trial court's conclusion that statements were freely and voluntarily given. *State v. Butler*, 165 Wn. App. 820, 827, 269 P.3d 315 (2012).

"A statement is involuntary if it is 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *United States v. Leon Guerrero*, 847 F.2d 1363 (9th Cir. 1988) (alterations in original) (quoting *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed.

29

2d 194 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L. Ed. 568 (1897))). The State argues that Officer Saenz did not make an offer to protect Mr. DeLeon or provide any consideration not provided to other inmates. But it fails to address the involuntariness that *Payne* and *Fulminante* demonstrate can arise where a state agent promises to protect an inmate from a threat posed by a third party. And as reflected in the United States Supreme Court's holdings in *Hutto* and *Bram*, a promise need not be express, it can be implied.

Relevant to our legal analysis is the fact that Sunnyside jail personnel are not acting solely out of kindness in obtaining gang affiliation information in order to safely house inmates. The Eighth Amendment of the United States Constitution imposes duties on prison officials, who must take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833 (internal citations, quotations and brackets omitted). A prison official who acts with deliberate indifference to the safety of an inmate, giving rise to a sufficiently serious danger to an inmate's safety, is subject to civil suit in the form of an Eighth Amendment failure-to-protect claim. *See id.* at 849.

Appellate counsel for the State admitted at oral argument that Sunnyside jail personnel could have obtained information needed to safely house prisoners by stopping with their first question: whether there were any inmates with whom the defendants should not be housed. We do not suggest that it was unreasonable for jail personnel to obtain more information than that for jail security purposes, but what we do hold is that when, as here, answering inculpatory questions on a gang documentation form is implicitly required for an inmate to obtain safe housing, then whatever incriminating answers the State gets are not voluntary for purposes of the Fifth Amendment. They are not admissible in a criminal trial.

We find support for this conclusion in several federal decisions suggesting that the threat of exposure to conditions of imprisonment that would violate the Eighth Amendment is not coercive so long as the State does not control that exposure. In *United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008) the Ninth Circuit Court of Appeals described the conditions in which a defendant was held by a Taiwanese ship's crew before the ship was boarded by the Coast Guard and Federal Bureau of Investigation (FBI) agents as "quite troubling," but emphasized that the defendant had been held in the ship's storage compartment "as the crew's prisoner, not the Coast Guard's or the FBI's. Once the FBI released Shi from the compartment and assumed custody, the district court found no evidence that the FBI intimidated or coerced Shi in any way." *Id.* at 728. Similarly, in *United States v. McVicker*, 979 F. Supp. 2d 1154 (D. Or. 2013), the defendant complained

31

that when interviewed in a Belize jail by agents of the United States Department of Homeland Security, the agents implied that only by waiving his Fifth Amendment rights would they assist him in getting out of Belize. The district court distinguished the facts of McVicker's case from *Fulminante* and *Payne*, pointing out that the federal agents "did not offer McVicker protection within the Belize City Jail and [made] it clear that they had no control over the conditions in that jail." *McVicker*, 979 F. Supp. 2d at 1190. By contrast, in *United States v. Bout*, 2011 WL 4389537 (S.D.N.Y. 2011), the court concluded that the defendant, having been arrested in Thailand and who faced a credible threat of violence in Thai jails, was coerced to make a statement to American agents: "The totality of the circumstances led Bout to believe that speaking with the agents was the only way he might escape being abandoned to the rough conditions of a Thai jail." *Id.* at *4.

Here, the State's own trial evidence demonstrated that there was a real and ongoing danger of violence and retaliation between rival gangs that presented these defendants with a credible threat of harm if housed with rival gang members in the Sunnyside jail. Officer Saenz testified at the CrR 3.5 hearing that the manner in which the jail undertakes to circumvent that danger to inmates is by asking them at booking whether there are "certain individuals or certain groups you can't be housed with;" if the inmate says that there are, then a Gang Documentation Form is completed. The totality of circumstances would lead an inmate being booked into the Sunnyside jail to believe that in order to avoid a real risk of danger posed by being housed with rival gang members, he would need to

32

answer "yes" when asked if there were certain individuals or groups he could not be housed with, and then provide the information for the Gang Documentation Form. RP (afternoon Sept. 28, 2010) at 43-44. The trial court erred in ruling that the statements of the defendants reflected in the Gang Disclosure Forms were voluntary for purposes of the Fifth Amendment.

Again, we examine whether the error was harmless; in this instance, the standard that applies is constitutional harmless error. That standard requires that—as to the verdicts to which the evidence is relevant (and here it was relevant only to the gang aggravator)—we look only to the untainted evidence to decide if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. McDaniel*, 83 Wn. App. 179, 187-88, 920 P.2d 1218 (1996) (quoting *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985)).

Given the other admissible evidence of Anthony DeLeon's and Mr. Robledo's gang affiliation, the information on their gang documentation forms was cumulative and can fairly be said to have been harmless for purposes of the jury's finding of the gang aggravator.

The same is not true for Ricardo DeLeon. The untainted evidence did not include any admission by Ricardo that he had ever been a member of a gang, no witness testified that he had ever been a member of a gang, and there was no testimony that his sole tattoo was gang-related. When arrested, Ricardo was wearing a red shirt bearing the acronym

33

but Mr. Flores had not died in a gang altercation, he committed suicide. Detective Ortiz agreed when cross-examined about the shirt that Mr. Flores's "friends and family wish to remember him." RP at 2016. Monica testified that while she did not know Ricardo, she had seen him at Julian Flores's house, establishing some personal connection between Ricardo and Mr. Flores—but not a gang connection. Monica claimed no knowledge of any gang affiliation by Ricardo.

The State also relied on the fact that one of two red bandannas found in the car was found in the back seat, where Ricardo was sitting. But only two red bandannas were found, and there were three occupants of the car. It would not have been difficult for a front seat passenger to toss his in the back of the car during the chase. Officers who succeeded in stopping the Taurus and arresting its passengers testified that Ricardo was sitting on the left side of the rear seat when the Taurus was finally stopped by police, next to a red cooler on his right that Detective Ortiz described as "large enough that it took up the whole right rear passenger side seating area." RP at 1870.

The untainted evidence that Ricardo acted "with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit or other advantage to or for criminal street gang, its reputation, influence, or membership" is not at all overwhelming. The exceptional sentence imposed on Ricardo based on the jury's finding of the gang aggravator must be reversed and remanded for further proceedings.

34

### C. Were Codefendants' Gang Information Forms Admitted In Violation Of The Hearsay Rule Or The Defendants' Sixth Amendment Rights?

Each defendant's statements to Officer Saenz reflected on the Gang Documentation Form was an admission by a party opponent under ER 801(d)(2) as between that defendant and the State but hearsay as to his codefendants, with no hearsay exception identified. ER 105 provides, however, that when evidence is admissible as to one party but not as to another, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. The trial court instructed the jury that "[y]ou may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant," thereby addressing any hearsay concern. CP at 617.

Less easily addressed is the implication of the codefendants' gang documentation forms on a defendant's right to confrontation under the Sixth Amendment. Here, none of the defendants testified, and each contends on appeal that admission of the Gang Information Forms of his codefendants violated his right to confrontation.

The confrontation clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the United States Supreme Court held that the defendant's confrontation rights under the Sixth Amendment were violated when he was "powerfully incriminat[ed]" by admission of a pretrial statement of

35

his codefendant, Evans, who did not take the stand at trial. *Bruton*, 391 U.S. at 135-37. The trial court gave the jury a limiting instruction that it could consider the confession only against Evans but in the context of Bruton's constitutional interest, the Supreme Court held that the limiting instruction was not enough. It stated that "the introduction of Evans' confession posed a substantial threat to [Bruton's] right to confront the witnesses against him, and this is a hazard [the Court] cannot ignore." *Bruton*, 391 U.S. at 137.

In *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), however, the Supreme Court validated the use of redaction and limiting instructions as ways of protecting criminal defendants' Sixth Amendment rights in most cases. During the underlying joint trial of codefendants Marsh and Williams, the State introduced the confession of Williams into evidence. Unlike the confession in *Bruton*, the State redacted Williams's confession so that it contained no explicit or implicit reference to Marsh. *Richardson*, 481 U.S. at 203. The trial court also admonished the jury not to use Williams's confession against Marsh. *Id.* at 204. The Supreme Court held that "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Id.* at 206. The holding was based on "the almost invariable assumption of the law that jurors follow their instructions." *Id.* The same result did not obtain in a case decided by the Supreme Court nine years later, where "[t]he blank space in an obviously redacted confession also points directly to the defendant," such that it had

36

the same powerfully incriminating effect as in *Bruton*. *Gray v. Maryland*, 523 U.S. 185, 194, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998). Under current confrontation clause jurisprudence, then, a limiting instruction will avoid a Sixth Amendment violation except in those cases where, because redaction cannot be done effectively, use of a nontestifying codefendant's statement "powerfully incriminates" a defendant.

Beginning with its 2004 decision in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) the Supreme Court has also clarified that the confrontation clause applies only to "testimonial" statements made by an out-of-court defendant. Since *Bruton* is based on the protections of the confrontation clause, "[i]t is . . . necessary to view *Bruton* through the lens of *Crawford*," with the result that *Bruton*'s restriction on the admission of the inculpatory statements by a jointly tried codefendant is limited to testimonial hearsay. *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010). As to what constitutes "testimonial hearsay," the Crawford Court recognized that "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'" were an example of a "core class of 'testimonial' statements." *Crawford*, 541 U.S. at 51. It also stated that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51.

37

Here, all defendants argue that statements of their codefendants reflected on the Gang Documentation Form are undisputedly testimonial in nature and were admitted without giving them a prior opportunity to cross-examine those witnesses, in violation of their Sixth Amendment right. The State contends that error under *Bruton* and *Crawford* was avoided because no defendant's Gang Documentation Form contained references to another defendant's gang affiliation and the jury was instructed that it was to consider the counts and defendants separately—thus, no statement by any codefendant constituted testimony against either of the other codefendants. *Cf. In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 546-47, 158 P.3d 1193 (2007) (where codefendant's statements did not refer to Hegney by name or otherwise, did not contain blanks or obvious deletions, and were accompanied by a limiting instruction, codefendant was not a witness against Hegney and the protections of the confrontation clause were not at issue).

Ricardo DeLeon replies that in this case the jury was not admonished not to use a defendant's gang documentation form in any way against his codefendants at the time the evidence was admitted, as was done in *Richardson*; and in his case, his brother's and Mr. Robledo's gang documentation forms were powerfully incriminating. Most significantly, he points out a problem with the limiting instruction—at least for purposes of the jury's decision on the gang aggravator. While instruction 6 told the jurors they could consider a statement made out of court as evidence against only that defendant, the court's instruction 29 stated:

> If you find the defendant guilty of the crime of First Degree Assault in Count 1; or of the crime of First Degree Assault in Count 2; or of the crime of First Degree Assault in Count 3, then you must determine if the following aggravated circumstance exists as to that count:
>
> Whether the defendant committed the crime of First Degree Assault with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang its reputation, influence, or membership.
>
> *When deliberating on this aggravating circumstance you may consider all the evidence presented during the trial without limitation.*

CP at 641 (emphasis added).

It is clear from the record of the jury instruction conferences that the intent of the third paragraph of instruction 29 was to override a different limiting instruction— instruction 8, which told jurors to consider gang evidence "only for the purpose of establishing a motive as to why the crime alleged was committed." CP at 619. Nonetheless, when read together, a reasonable juror would understand instruction 29 to also override instruction 6. Instruction 29 invited jurors—for purposes of deciding whether the gang aggravator applied—to consider a statement made out of court as evidence against any defendant.

Applying the confrontation clause analysis laid out in *Richardson*, the fact that the jurors were invited to consider his codefendants' gang documentation forms as evidence against Ricardo DeLeon in deciding whether the gang aggravator applied resulted in their being witnesses against him. No defendant was named on any other defendant's gang documentation form. But *Richardson* makes clear that where a nontestifying

39

codefendant's statement is admitted into evidence it is the admonishment or limiting instruction to the jury that prevents the codefendant from being a witness "against" the defendant.[6] The *Richardson* Court recognized that even a statement that does not expressly implicate a defendant can implicate him when linked with other evidence. *Richardson*, 481 U.S. at 208-09.[7]

Instruction 29 and our assumption that jurors follow instructions compels the conclusion that, as to the gang aggravator, nontestifying codefendants were witnesses against one another through the gang documentation forms, which were testimonial in nature. Admission of the forms without an effective limiting instruction violated the defendants' Sixth Amendment right, although only with respect to the jury's finding that the gang aggravator applied.

---

[6] "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant *if the jury is instructed to consider that testimony only against a codefendant.* This accords with the almost invariable assumption of the law that jurors follow their instructions." *Richardson*, 481 U.S. at 206 (emphasis added).

[7] The fact that the gang information forms do not name other defendants defeats Ricardo DeLeon's alternative argument that they fell within the *Bruton* exception. *Richardson* explains that whether a codefendant's statement incriminates the defendant on its face is important to determining whether the statement falls within the narrow *Bruton* exception for codefendant statements so powerfully incriminating that even a proper jury instruction will not protect a defendant's Sixth Amendment rights. 418 U.S. at 208. *See also Gray*, 523 U.S. at 195 ("We concede that *Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially.").

Confrontation clause errors are subject to constitutional harmless error analysis. *State v. Lui*, 179 Wn.2d 457, 528, 315 P.3d 493 (2014). As previously observed, in the case of Anthony's and Mr. Robledo's gang documentation forms, the information reflected was cumulative of gang affiliation that was also established through their statements to Detective Ortiz, Monica Mendoza's testimony, their clothing, tattoos, and Anthony's cell phone contents. Given the unlikelihood that Ricardo's information would have influenced the jury with respect to his more clearly gang-affiliated codefendants, and the fact that Anthony's and Mr. Robledo's information was cumulative, we are satisfied beyond a reasonable doubt that the jury's consideration of a nontestifying defendant's gang documentation forms against his codefendants would not have contributed to the jury's verdicts.

> *II. Is The Trial Court's Imposition Of An Exceptional Sentence On The Gang Aggravator Supported By The Record?*

The appellants argue that the evidence was insufficient to support the gang aggravator, complaining here, as they did in arguing that gang evidence was admitted in violation of ER 404(b), about the State's generalized gang evidence. Generalized gang evidence is problematic in both contexts. Absent (1) evidence showing that general evidence about gang behavior was adhered to by the defendant or his alleged gang and (2) a finding that the evidence relating to gangs is relevant to prove the elements of the charged crime, then generalized evidence may give rise to the forbidden inference under

41

ER 404(b) and, in the context of examining the sufficiency of evidence, no probative value can be ascribed to it.

We review a jury's verdict on an aggravating factor for substantial evidence just as we do when evaluating the sufficiency of the evidence supporting the elements of a crime. *State v. Webb*, 162 Wn. App. 195, 205-06, 252 P.3d 424 (2011). After viewing the evidence in a light most favorable to the State (which still requires that we ascribe no weight to generalized gang evidence having no nexus to the crimes charged), we ask whether any rational trier of fact could have found the essential elements of the charge beyond a reasonable doubt. *Yarbrough*, 151 Wn. App. at 96; *State v. Moreno*, 173 Wn. App. 479, 495-97, 294 P.3d 812, *review denied*, 177 Wn.2d 1021 (2013) (gang membership alone and general statements from police or gang experts are insufficient; the State must establish a nexus between the crime and the defendant's motivations to benefit a gang).

In order for the court to impose the exceptional sentences requested by the State, the State was required to show that the defendants committed the assault "with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang[,] its reputation, influence, or membership." CP at 641; RCW 9.94A.535(3)(aa).

When we disregard the improperly admitted Gang Documentation Forms and the insufficiently relevant generalized gang evidence (the evidence unrelated to the elements

42

of the charged crime, the participants in the charged crime, or the gangs to which they belonged or with which they were associated), sufficient evidence was presented to persuade a rational trier of fact beyond a reasonable doubt that the gang aggravator applied. In the case of Anthony and Mr. Robledo, their active gang membership was abundantly demonstrated by their statements to Detective Ortiz, their clothing, their gang-related tattoos, the pictures and songs stored on Anthony's cell phone, and Monica Mendoza's testimony. That there was a gang-related motivation for their presence at the Cardenas home and the shooting was sufficiently demonstrated by their presence driving in a Sureño neighborhood, past a known Sureño-associated home, with red bandannas tied over the faces of occupants in the car, and the response to Mr. Acevedo's flashing an LVL sign—both the yelling and then the shots fired. Detective Ortiz provided expert testimony about putting in work and retaliation sufficiently related to the Norteño gangs, and potentially explaining these acts, to be relied upon by the jury.

While less evidence supported the gang aggravator's application to Ricardo, it was still sufficient. There was the same evidence that there was a gang-related motivation for the men's presence in a Sureño neighborhood and at the Cardenas home, the same evidence of what triggered the violence, the same evidence of red bandannas being worn, his red shirt with the picture of Julian Flores, and the expert testimony of Detective Ortiz. Although we have concluded in addressing the erroneous admission against Ricardo of his involuntary gang documentation form that a rational trier of fact *might not* have found

43

the gang aggravator against him had that form been excluded, we nonetheless conclude that there was sufficient evidence from which a rational trier of fact *could* find the aggravator. We remand for a trier of fact to make that determination.

### III. Further Communications–Juror Misconduct

#### A. Denial Of Motion For A New Trial Based On A Juror's Improper Use Of A Twitter Account

The jurors took an oath at the outset of the trial below "to well and truly try this case according to the evidence and the instructions of the Court." RP at 487. The court instructed the jurors, "You can't discuss this case in any regard, your feelings, what the evidence is, nothing." RP at 491. The court's instructions not to discuss the case with outside third parties were repeated throughout the trial and again at the outset of jury deliberations.

Three days later, just as the jury indicated it had reached a verdict, the bailiff provided the court with a Twitter printout showing that one of the jurors had been tweeting communications about the trial during the evidentiary and deliberation phases. The record does not disclose when the communications came to light.

Many of the tweets were cryptic and some were incoherent. They did not discuss case-specific facts, did not contain evidence of extraneous influence on the juror in terms of deciding the case, and did not suggest a predisposed outcome. At most, the tweets show the juror had a negative attitude about the justice system, the length of jury service,

44

and the lawyers involved. Several of the tweets were explicitly or implicitly critical of law enforcement: for example (and from earlier to later), "The largest known street gang in the world: Police," "I'm not against the police. I'm just afraid of them—I'm not afraid of them, I'm just against the system they serve," and "It's time to set the record straight that MJ was/is and always has been innocent—I actually believe that now." CP at 645.

After the court, the prosecutor, and all three defense lawyers reviewed the printout, the court asked each of the lawyers whether there was a need to question the juror before bringing the jury in to announce the verdict. The prosecutor expressed concern that the juror had made the communications, but considered the matter moot since a verdict had apparently been reached. Anthony DeLeon's lawyer was concerned that the juror did not follow the court's instructions. He was also troubled by the comment possibly suggesting a score of 3 to 9.[8] But he concluded there was no reason to interview the juror. Ricardo DeLeon's counsel was likewise concerned that the juror disregarded the court's "simple and explicit" instructions not to communicate about the trial. But he concluded that the content of the communications "doesn't really say all that much." RP at 2409. He asked that the printout be made part of the record, but waived any requirement to question the juror. Mr. Robledo's counsel took the same position as Ricardo DeLeon's counsel.

---

[8] An October 22, 2010 tweet read, "you fighting the good fight my friend? Good for you! - There are 2 others as well. ;-) Score 3 : 9 ;-)." CP at 645.

45

Having heard out the lawyers, the court decided not to interview the juror. No party moved for a mistrial at that time. The verdicts were read and the jury polled.

Ricardo DeLeon filed a timely motion for new trial, contending that the juror committed misconduct and that the court should have investigated the juror and removed him as unfit when the communications came to light. Mr. Robledo timely joined in the motion.[9] In opposing the motion, the State argued that the defense had made a tactical decision to waive the conduct and receive the jury's verdict.

The trial court denied the motion for a new trial, stating that the Twitter communications were unquestionably misconduct but did not rise to the level that the juror should have been excused. It attached importance to the facts that the tweets were "almost exclusively comments about the system, not about the facts of the case," and "[t]here was nothing to suggest in the tweets . . . that he was discussing the facts of this case with anybody in particular." RP (Jan. 20, 2011) at 21.

The court also observed the following dilemma that was presented by the tenor of the tweets and the timing of their discovery:

> The comments were very clearly negative towards law enforcement.
> Clearly there was no motion to have this juror excused for misconduct at the time. Had I done so, I would have had to excuse this juror knowing that he had made comments that would be certainly

---

[9] Anthony DeLeon attempted to join in the new trial motion on November 22, 2010, which the court ruled was too late. His assignment of error to ineffective assistance of counsel for the tardy attempt at joinder is addressed *infra.*

construed as favorable to the defense and against the [S]tate. That could have been characterized as an abuse of discretion.

*Id.* at 21-22.

Mr. Robledo assigns error to the trial court's denial of his motion for a new trial.[10] He argues that juror misconduct is a basis for mistrial and that the court's and lawyers' failure to inquire further violated his right to a fair trial. Anthony alluded to a similar argument but primarily contends his counsel was ineffective for failing to move for a mistrial (addressed infra). Ricardo DeLeon has joined in Anthony's arguments in his statement of additional grounds.

### 1. *Juror misconduct as basis for a new trial*

RCW 2.36.110 states that a judge has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice . . . or by reason of conduct or practices incompatible with proper and efficient jury service." CrR 6.5 outlines procedures for discharging an unfit juror after deliberations have begun and replacing the juror with an alternate. Together, RCW 2.36.110 and CrR 6.5 "place a 'continuous obligation' on the trial court to investigate allegations of juror unfitness and to excuse jurors who are found to be unfit."

---

[10] Although his brief speaks of denying a motion for mistrial, we recognize that he intends to challenge the new trial motion, there having been no motion for a mistrial based on juror misconduct.

*State v. Elmore*, 155 Wn.2d 758, 773, 123 P.3d 72 (2005) (quoting *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000)).

A trial judge has broad discretion to conduct an investigation of jury problems and may investigate accusations of juror misconduct in the manner most appropriate for a particular case. *Elmore*, 155 Wn.2d at 773-75; *State v. Earl*, 142 Wn. App. 768, 775, 177 P.3d 132 (2008). The court need not follow any specific format. *Jorden*, 103 Wn. App. at 229. In cases involving potential misconduct, however, "the trial judge is faced with a 'delicate and complex task,' in that he or she must take care to respect the principle of jury secrecy." *Elmore*, 155 Wn.2d at 761 (quoting *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997)). The court's inquiry should not risk violating "the cardinal principle that juror deliberations must remain secret." *Id.* at 770.

"A juror's communication with a third party about the case constitutes misconduct." *See State v. Depaz*, 165 Wn.2d 842, 859, 204 P.3d 217 (2009). Juror misconduct can warrant a mistrial. *See State v. Applegate*, 147 Wn. App. 166, 175-76, 194 P.3d 1000 (2008). A new trial is warranted only where juror misconduct has prejudiced the defendant, however. *Earl*, 142 Wn. App. at 774.

No published Washington case is cited or found that involves a juror using social media such as Twitter to communicate to third parties about the case during the trial. A seminal federal case on the topic is *United States v. Fumo*, 655 F.3d 288 (3rd Cir. 2011). In *Fumo*, a juror made numerous Facebook and Twitter comments during a five-month

48

trial, expressing wonder about when various stages of the trial would end. When Fumo learned of the comments he moved to disqualify the juror. After an in camera hearing that included an interview of the juror, the judge found that the postings were in violation of instructions not to discuss the case with anyone outside the jury room, but were "nothing more than harmless ramblings having no prejudicial effect." *Id.* at 299. The judge further found the comments were vague and virtually meaningless in that they raised no specific facts dealing with the trial, and nothing indicated any predisposition toward anyone involved in the suit. *Id.* at 306. The appellate court agreed and held that the district court did not abuse its discretion in denying Fumo a new trial when no prejudice was shown. *Id.* at 306-07.

The *Fumo* court's observations about juror use of social media are nonetheless apropos:

> Not unlike a juror who speaks with friends or family members about a trial before the verdict is returned, a juror who comments about a case on the Internet or social media may engender responses that include extraneous information about the case, or attempts to exercise persuasion and influence. If anything, the risk of such prejudicial communication may be greater when a juror comments on a blog or social media website than when she has a discussion about the case in person, given that the universe of individuals who are able to see and respond to a comment on Facebook or a blog is significantly larger.

655 F.3d at 305.

49

We review a trial court's ruling on a motion for new trial for abuse of discretion. *State v. Jackman*, 113 Wn.2d 772, 777, 783 P.2d 580 (1989). While most trial judges in most circumstances would (and should) interview a juror upon learning of a violation of the court's instructions not to communicate with third parties about a case, we are satisfied that under the particular facts of this case, the trial court did not abuse its discretion by deciding not to interview the juror or investigate further. It is clear that the juror committed misconduct, which the trial court recognized. It conducted investigation to the extent of obtaining a copy of the Twitter printout after learning of the juror's communications. The strongly predominating theme of the tweets—the juror's negative attitude about the justice system, the length of jury service, and lawyers—probably did not *necessitate* further inquiry. *See Commonwealth v. Werner*, 81 Mass. App. Ct. 689, 697, 967 N.E.2d 159 (2012) (and cases cited therein) ("attitudinal expositions" on jury service, protracted trials and guilt or innocence that fall far short of the prohibition against extraneous influence do not warrant further inquiry). And because the discovery came during deliberations—indeed, after a verdict had apparently been reached—inquiry by the court presented a heightened risk of upsetting the sanctity of the jury's deliberations. For that reason, and because Messrs. DeLeon and Robledo have demonstrated no prejudice, we find no error.

We reverse the exceptional sentence imposed on Ricardo DeLeon based on the gang aggravator and remand for a new trial on the aggravator and resentencing. We otherwise affirm. The State's cross appeal is dismissed as abandoned.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

## 2. *Ineffective assistance*

As earlier indicated, Anthony contends his counsel was ineffective for failing to make a mistrial motion and for failing to timely join in his codefendants' motion for a new trial on the juror misconduct issue. Mr. Robledo's brief also alludes to an issue of ineffective assistance of his trial lawyer for not insisting on further investigation of the juror. To demonstrate ineffective assistance of counsel, a defendant must prove (1) defense counsel's representation fell below an objective standard of reasonableness and (2) the deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Since both prongs are required, there is no reason for a court addressing an ineffective assistance claim to address both the performance and prejudice prongs if the defendant makes an insufficient showing on one. *Strickland*, 466 U.S. at 697. We strongly presume that defense counsel's representation was effective. *McFarland*, 127 Wn.2d at 335. Reasonable trial tactics are not deficient

51

performance and do not support an ineffective assistance claim. *State v. Hendrickson*,

129 Wn.2d 61, 77-78, 917 P.2d 563 (1996).

Here, it is apparent that the defense lawyers elected to gamble on the verdict—an

entirely reasonable strategy when several tweets showed the juror's displeasure with the

justice system and police, and one tweet (albeit cryptic) could be interpreted to suggest

the jury was at one point deadlocked one way or the other at 3 votes to 9. Given the

substance of the tweets, for the defense lawyers to forgo further investigation was

legitimate trial strategy. And Anthony suffered no prejudice from counsel's failure to

timely join in the new trial motion when no new prejudicial circumstances came to light.

### IV. Additional Issues Raised By Anthony DeLeon

#### A. Did The Trial Court Abuse Its Discretion In Denying Bifurcation Of Trial On The Gang Aggravator?

Anthony DeLeon's argument challenging the exceptional sentences imposed by the

court include an additional contention that the court erred in refusing to bifurcate the trial

of the assault charges from the gang aggravator. "Bifurcation is inappropriate if a unitary

trial would not significantly prejudice the defendant or if there is a substantial overlap

between evidence relevant to the proposed separate proceedings." *State v. Monschke*,

133 Wn. App. 313, 335, 135 P.3d 966 (2006). The court's bifurcation decision is

reviewed for abuse of discretion. *Id.*; *State v. Roswell*, 165 Wn.2d 186, 192, 196 P.3d 705

(2008). The court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds. *Junker*, 79 Wn.2d at 26.

At the outset of trial, the court denied the defense request to bifurcate, reasoning that the jury would consider all of the gang evidence for motive purposes during the trial and the evidence would be the same with respect to the aggravator. Thus, there would be no prejudice in keeping the proceeding unitary. The defendants renewed their request for bifurcation during the instruction conference and the court adhered to its earlier decision. Other than arguing that no evidence supports the aggravating factor, Mr. DeLeon offers no analysis to support his abuse of discretion claim. The court's decision to deny bifurcation was a tenable exercise of discretion.

### B. Did The Trial Court's Instruction On Transferred Intent Misstate The Law?

Citing to the dissenting opinion in *State v. Elmi*, Mr. DeLeon argues that for purposes of a criminal assault "[t]here must be an *actual intention to cause apprehension, unless there exists the morally worse intention to cause bodily harm.*" *State v. Elmi*, 166 Wn.2d 209, 223, 207 P.3d 439 (2009) (Madsen, J., dissenting). He argues that the State's evidence of the required specific intent to cause apprehension or bodily harm to Mr. Lopez and Mr. Acevedo was weak, since Mr. Lopez was only emerging from the house when the gunfire started, Mr. Acevedo ducked down behind a parked car when he saw a gun, and the State presented no evidence of where the bullets hit in relation to Mr.

53

Acevedo. Mr. DeLeon argues that it was only through instruction 16,[11] which he argues

is an incorrect statement of the law, the State was able to satisfy the required element of

intent for the counts relating to Mr. Lopez and Mr. Acevedo, by relying on proof of a

transferred specific intent to cause bodily harm to Mr. Cardenas.

In *Elmi*, a defendant who shot into his estranged wife's house was convicted not

only of attempted first degree murder against his wife, but also of first degree assault

against children who were present in the house during the shooting. The court rejected

Elmi's argument that the State was required to prove he had the specific intent to assault

the children. The court held by a 6 to 3 majority that when a person shoots into a building

intending to harm a certain occupant, this intent transfers under the assault statute to any

victims who were unintentionally harmed or put in apprehension of harm. *Elmi*, 166

Wn.2d at 218. The court explained that RCW 9A.36.011 "encompasses transferred

intent" and decided the issue based on the statute, not on the common law doctrine of

transferred intent. All that remained to be proved was that the uninjured, unintended

victims had been put in apprehension of harm. Applying *Elmi*, then, whether or not the

---

[11] Instruction 16 provided:

> If a person acts with intent to assault another, but assaults a third person,
> the actor is deemed to have acted with intent to assault the third person.
> The unintended victims do not need to be physically injured and the
> defendant need not know of their presence.

CP at 627.

54

shooter in the Taurus knew that Mr. Lopez and Mr. Acevedo were present or intended harm to each of them is of no moment, as long as the State proved the defendants' intent to inflict great bodily harm on one person.

Mr. DeLeon urges this court to adopt the position of the dissenting justices in *Elmi*, who would have held that transferred intent should apply only to those assaults in which there is an actual battery against an unintended victim, or when there is proof that the shooter actually intended to cause apprehension in unharmed victims. But we may not disregard directly controlling authority of our Supreme Court in favor of a dissenting opinion that Mr. DeLeon believes is better reasoned. *See 1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006); *MP Med. Inc. v. Wegman*, 151 Wn. App. 409, 417, 213 P.3d 931 (2009).

### C. Ineffective Assistance Of Counsel

Anthony DeLeon makes additional claims that his lawyer was ineffective for: (1) failure to request a lesser degree instruction on second degree assault, (2) failure to recognize a venue problem, and (3) failure to recall and conduct cross-examination of Monica Mendoza. We address the claims in turn.

### 1. Failure to request a lesser degree instruction

Mr. DeLeon argues that because second degree assault is a lesser degree offense of first degree assault, and because (according to him) the two methods of committing

second degree assault provided by RCW 9A.36.021(1)(c) and (e) could have applied to counts 2 and 3 (charging him with first degree assault of Messrs. Acevedo and Lopez), his lawyer was ineffective for failing to request such instruction.

Under RCW 10.61.003, a criminal defendant can be found guilty of a crime that is an inferior degree of the crime charged. A defendant is entitled to a lesser degree offense instruction if

> "(1) the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense."

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)). The first two factors are the legal components of the test, while the third factor entails a factual inquiry. *Id.* at 454-55.

"Every degree of assault is a lesser included offense of all higher degrees of assault," so Mr. DeLeon readily satisfies the legal component of the test. *State v. Foster*, 91 Wn.2d 466, 472, 589 P.2d 789 (1979). The focus is on the factual component, i.e., whether there is evidence that, as to counts 2 and 3, Mr. DeLeon, as a principal or accomplice, committed only second degree assault under either RCW 9A.36.021(1)(c) or (e).

The factual component of the inferior degree offense test requires a factual showing supporting the lesser crime that must be "more particularized than that required

56

for other jury instructions." *Fernandez-Medina*, 141 Wn.2d at 455. "[T]he evidence must raise an inference that *only* the lesser included/inferior degree offense was committed to the exclusion of the charged offense." *Id.* "When determining if the evidence at trial was sufficient to support the giving of an instruction, the appellate court is to view the supporting evidence in the light most favorable to the party that requested the instruction." *Id.* at 455-56. But "the evidence must affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." *Id.* (citing *State v. Fowler*, 114 Wn.2d 59, 67, 785 P.2d 808 (1990), *overruled on other grounds by State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991)).

Mr. DeLeon first contends that his lawyer overlooked the fact that second degree assault under RCW 9A.36.021(1)(e) would allow for a lesser degree instruction. In the case of subsection .021(1)(e), this required that there was evidence from which the jury could find that Mr. Lopez and Mr. Acevedo were "with intent to commit a felony, assault[ed]," "under circumstances not amounting to first degree assault." Mr. DeLeon contends there was evidence from which the jury could find that the two men were assaulted (apprehended harm) during a felony drive-by shooting. RCW 9A.36.045(1). He argues that subsection .021(1)(e) places no limitation on which felonies can serve as the predicate offense for a second degree assault.

The State dismisses the argument out of hand, based on what it perceives to have been the trial court's reason for refusing to instruct the jury on *drive-by shooting itself* as a lesser included offense of first degree assault: the different states of mind required for the two offenses. It contends that "the element of recklessness remains in the crime of drive-by shooting, so second degree assault based upon RCW 9A.36.021(1)(e) could no more be a lesser included offense than drive-by shooting by itself." Br. of Resp't at 20.

But *State v. Ferreira*, 69 Wn. App. 465, 470, 850 P.2d 541 (1993), on which the court relied in concluding that drive-by shooting (formerly called reckless endangerment) was not a lesser included offense of assault, cannot reasonably be read to turn on the fact that assault is an intentional crime and drive-by shooting requires recklessness. *See* RCW 9A.08.010(2) (providing that when a statute provides that when recklessness suffices to establish an element, such element is also established if a person acts intentionally); *cf. State v. Grier*, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011) (holding that the Court of Appeals, in *State v. Grier*, 150 Wn. App. 619, 635, 208 P.3d 1221 (2009), correctly analyzed the legal prong of the *Workman*[12] test in concluding that the elements of manslaughter are necessary elements of intentional second degree murder). Rather, *Ferreira* appears to have turned on the distinct drive-by shooting elements of, e.g.,

---

[12] *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978).

proximity to a motor vehicle. The State's dismissive treatment turns on a flawed assumption about *Ferreira*.

Nonetheless, when we apply the factual component, there is no affirmative evidence that raises an inference that only the inferior degree offense was committed to the exclusion of the charged offense—and it is because of the same broad transfer of intent encompassed by RCW 9A.36.011 to which Mr. DeLeon so vigorously objects as a matter of jury instruction. The evidence presented, viewed in the light most favorable to Mr. DeLeon, was that passengers in a Taurus automobile fired nine shots into the area in front of the Cardenas home where Mr. Cardenas, Mr. Acevedo, and Mr. Lopez were standing. While there was some evidence that would affirmatively establish that Mr. DeLeon and the other defendants were not involved in the crime at all, there was no evidence that would raise an inference that if Mr. DeLeon was involved, he committed only drive-by shooting, to the exclusion of first degree assault.

Given Mr. DeLeon's more narrow view of what is legitimate transferred intent, he would presumably point to affirmative evidence of, e.g., darkness, limited visibility, where the bullets struck and Mr. Lopez's emergence from the home just as shots were fired, and cite that as affirmative evidence that the shooters might not have been able to see Mr. Lopez and Mr. Acevedo and might not have been shooting at them. But as construed in *Elmi*, that evidence would not have prevented the jury from finding the defendants guilty of first degree assault of those victims.

59

Mr. DeLeon also contends that his lawyer failed to recognize that second degree assault under RCW 9A.36.021(1)(c) would allow for a lesser degree instruction. In the case of subsection .021(1)(c), this required that there was evidence from which the jury could find that Mr. Lopez and Mr. Acevedo were assaulted with a deadly weapon "under circumstances not amounting to first degree assault." This argument is even more clearly based on Mr. DeLeon's belief that, contrary to *Elmi*'s construction of RCW 9A.36.011, proof of first degree assault of an uninjured victim requires proof of an actual intent to cause apprehension and fear of bodily injury to, or to inflict bodily harm upon, that uninjured victim.

Mr. DeLeon argues, citing *State v. Adlington-Kelly*, 95 Wn.2d 917, 924, 631 P.2d 954 (1981), that it is not the presence of a firearm that elevates an assault from second degree to first degree assault, but the specific intent to inflict great bodily harm or death. He argues that that specific intent cannot be presumed but may be inferred as a logical probability from all the facts and circumstances, citing *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994), and that specific intent is the intent to produce a specific result, as opposed to intent to do the physical act that produces the result. *State v. Esters*, 84 Wn. App. 180, 184, 927 P.2d 1140 (1996). From this he argues that for counts 2 and 3 the State was required to prove an actual intent to inflict bodily harm upon Acevedo and Lopez or to create apprehension in their minds.

60

Here, too, Mr. DeLeon disregards the majority opinion in *Elmi*, under which the required intent to inflict great bodily harm on one victim transfers to others who apprehend harm, even if the shooter does not see those victims. Applying the factual test, and given the testimony of Messrs. Acevedo and Lopez that they experienced apprehension of being wounded, the evidence does not raise an inference that only the inferior degree offense of second degree assault was committed to the exclusion of first degree assault.

Mr. DeLeon's lawyer did not perform deficiently by not requesting a second degree assault instruction.

### 2. *Failure to timely challenge venue*

Mr. DeLeon next contends that his trial lawyer was ineffective for failing to timely raise a venue challenge on the eluding count.

A criminal defendant has a constitutional right to be tried by a jury "of the county in which the offense is charged to have been committed." WASH. CONST. art. I, § 11. CrR 5.1(a) requires that all actions be commenced in the county where the offense was committed, or in any county where an element of the offense was committed or occurred. CrR 5.1(b) provides that "[w]hen there is reasonable doubt whether an offense has been committed in one of two or more counties, the action may be commenced in any such county."

"Venue is not an element of a crime." *State v. Pejsa*, 75 Wn. App. 139, 145, 876 P.2d 963 (1994). Rather, it is a constitutional right that is waived if not asserted in timely fashion. *Id.* (citing *State v. McCorkell*, 63 Wn. App. 798, 822 P.2d 795 (1992)). Generally, a defendant waives a challenge to venue by failing to present it before jeopardy attaches, i.e., before the jury is sworn in a jury trial. *McCorkell*, 63 Wn. App. at 801. An exception may arise if the evidence produced at trial raises a venue issue for the first time. *State v. Dent*, 123 Wn.2d 467, 480, 869 P.2d 392 (1994). The defendant must then raise the issue at the end of the State's case and if the evidence reveals a genuine issue of fact about venue, it becomes a question for the jury to determine by a preponderance of the evidence. *Id.*

A couple of weeks into trial, and as the State was nearing the close of its case, Mr. DeLeon moved for dismissal of the eluding count for lack of venue, explaining that it had been brought to his attention that testimony of State witnesses suggested "that the entire eluding incident from the time that the lights came on . . . happened entirely in Benton County." RP at 1850. The court denied the motion as untimely because a police report provided to the defense in discovery indicated the chase might have begun at milepost 75.5—just over the Benton County line—thereby putting Mr. DeLeon on notice of a venue issue before jeopardy attached.

Mr. DeLeon now argues that because his lawyer was on notice of the venue issue and failed to raise a timely challenge to venue, he was ineffective. The State responds in

62

part, and correctly, that there is conflicting evidence whether the offense was committed only in Benton County. Trial testimony revealed that the dividing line for Yakima and Benton Counties on Interstate 82 is at milepost 75.25; that Grandview Officers Martin and Chilson activated the lights and sirens at about milepost 75.5, which is just over the Benton County line; that Prosser and Sunnyside units were also involved in the chase; that Officer Martin testified that just before he activated his lights, a Sunnyside officer blew by with its lights engaged at milepost 75; and that Grandview Officer Barnett's testimony indicates that the Sunnyside officer with lights engaged had already passed him before milepost 75.

As previously discussed, a defendant alleging ineffective assistance of counsel must demonstrate both the deficient performance of his lawyer and prejudice, and we need not address both the performance and prejudice prongs if the defendant makes a deficient showing on one. In this instance, Mr. DeLeon cannot demonstrate prejudice—this issue of disputed fact would have been submitted to the jury, which could have resolved it either way.

### 3. *Failure to recall witness Monica Mendoza*

Finally, Mr. DeLeon contends that the defense theory that the defendants were misidentified was undermined by the fact that his lawyer never recalled Monica Mendoza to the stand for cross-examination after her direct testimony was completed. Her

statements to investigating officers had been inconsistent, and Mr. DeLeon argues that there was no legitimate reason not to subject her to cross-examination.

During Monica's direct testimony (in which she positively identified Anthony and Mr. Robledo as occupants of the car from which the gunshots were fired at the Cardenas home), the judge allowed her to leave court to pick up her children from school, but did not excuse her as a witness, expressly contemplating that she would return on another day to finish any further direct testimony and then be subject to cross-examination. She did not return for further testimony. The record is silent as to why.

For defense purposes, officers and detectives to whom Monica had provided statements had testified and been cross-examined, and during closing argument, Anthony's lawyer was able to argue that during the course of the investigation, Monica gave inconsistent statements about the number and identity of the occupants of the Taurus and could not keep her story straight. He also argued that the only people who identified the defendants were LVL-affiliated individuals who had motive to accuse Norteños, even if untruthfully.

Not only does Mr. DeLeon fail to show that he was prejudiced by an omission of his lawyer (that his lawyer could have procured Monica's further attendance and damaging testimony not presented in her direct examination), but he fails to demonstrate that his lawyer's decision not to subject Monica to further examination was not tactical. Since Monica's inconsistency could be proved through other witnesses, Mr. DeLeon's

lawyer might reasonably have concluded that cross-examining Monica would, at best, provide only cumulative evidence of her inconsistency and, at worst, could give her a chance to explain herself. In short, inviting Monica to testify further might have presented more downside than upside for Mr. DeLeon.

Here again, Mr. DeLeon's ineffective assistance claim fails.

### D. Sentencing Issues

### 1. Firearm enhancement

The trial court doubled Anthony DeLeon's firearm enhancement, relying on RCW 9.94A.533(3)(d)[13] and a representation by the State—a presumed agreement by Mr. DeLeon—that a 1997 manslaughter conviction of Mr. DeLeon included a firearm enhancement. Nothing in the record shows that the State produced the 1997 manslaughter judgment and sentence during the sentencing proceedings. At issue is whether the State's proof of the judgment and sentence was required.

At sentencing, the State bears the burden of proving prior convictions by a preponderance of the evidence. *State v. Mendoza*, 165 Wn.2d 913, 920, 205 P.3d 113 (2009). To meet this burden, the State must first produce "evidence of some kind" bearing "minimum indicia of reliability" that supports "the alleged criminal history."

---

[13] The statute provides in pertinent part that if an offender is being sentenced for any firearm enhancements "and the offender has previously been sentenced for any deadly weapon enhancements after July 23, 1995 . . . all firearm enhancements under this subsection shall be twice the amount of the enhancement listed." RCW 9.94A.533(3)(d).

*State v. Ford*, 137 Wn.2d 472, 480-81, 973 P.2d 452 (1999). "The best evidence of a prior conviction is a certified copy of the judgment." *Id.* at 480. A defendant, may, however, affirmatively acknowledge his criminal history and thereby obviate the need for the State to produce evidence. *Mendoza*, 165 Wn.2d at 920.

> With regard to what suffices as an acknowledgment, *Mendoza* emphasizes
>
> the need for an *affirmative* acknowledgment by the defendant of *facts and information* introduced for the purposes of sentencing. The mere failure to object to a prosecutor's assertions of criminal history does not constitute such an acknowledgment. Nor is a defendant deemed to have affirmatively acknowledged the prosecutor's asserted criminal history based on his agreement with the ultimate sentencing recommendation.

165 Wn.2d at 928 (citations and footnote omitted).

The State explained in its sentencing memorandum that under RCW 9.94A.533(3)(d), Mr. DeLeon's three firearm enhancements must be doubled from 60 to 120 months because he had a prior manslaughter conviction with a firearm enhancement. Mr. DeLeon acknowledged in his sentencing memorandum that he was convicted of manslaughter in the shooting death of a friend and that his current firearm enhancements were thus 120 months each. He argued under a same criminal conduct analysis that he should receive only one doubled enhancement of 120 months. The parties maintained these positions during the sentencing hearing.

Where the State explained that the 120-month enhancement requested was based on doubling in light of a prior manslaughter conviction with a firearm enhancement and

Mr. DeLeon's response acknowledged both the manslaughter conviction and that one resulting 120-month enhancement doubled figure was appropriate, this reflects an affirmative acknowledgement by the defense of facts and information. No resentencing is required.

### 2. *Community custody conditions*

Mr. DeLeon challenges two conditions of community custody imposed by the court: (1) wear no clothing associated with or signifying membership in a criminal street gang and (2) do not obtain any new tattoos, brands, burns, piercings or any voluntary scarring related to gang membership or association. Relying on *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008), he contends the conditions are overly broad and invade his First Amendment rights of association and freedoms of speech and expression.

The Sentencing Reform Act of 1981, chapter 9.94A RCW, empowers trial courts to impose "crime-related prohibitions" during the course of community custody. RCW 9.94A.703(3)(f); RCW 9.94A.505(8). A "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). Crime-related prohibitions are reviewed for abuse of discretion. *State v. Riley*, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993).

To avoid running afoul of the due process protection against vagueness, sentencing conditions must adequately inform the offender of what conduct they either require or proscribe. *State v. Sanchez Valencia*, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010); *Bahl*, 164 Wn.2d at 752. Under Washington law, conditions that restrict First Amendment rights are permissible if they are "sensitively imposed" and are reasonably necessary to accomplish the essential state needs and public order. *Id.* at 757-58. "This meshes with the vagueness doctrine's principle that where the challenged law involves First Amendment rights, a greater degree of specificity may be demanded." *Id.* at 757.

Here, the community custody prohibitions are sufficiently crime related. The prohibitions only restrict clothing and tattoos or markings that signify gang membership or association. They do not prohibit Mr. DeLeon from wearing any particular color or item of clothing so long as the item does not also signify membership or association in a criminal street gang. He is not prohibited from obtaining a tattoo or marking, so long as it does not relate to gang association or membership. The conditions adequately inform him of conduct that the trial court agreed were crime related and reasonably necessary to protect the public order by restricting criminal street gang activity.

## STATEMENTS OF ADDITIONAL GROUNDS

Each defendant filed a pro se statement of additional grounds (SAG).

68

Ricardo DeLeon SAG

Ricardo DeLeon raises the same issues in his SAG that counsel for Anthony

DeLeon raised on appeal, through photocopied pages of the brief filed by Anthony's

lawyer. But for the ineffective assistance of counsel claim based on the venue issue,

which Ricardo DeLeon has no standing to make, all of Ricardo's SAG issues abide the

analysis and outcome of the issues raised by Anthony's counsel.

Anthony DeLeon SAG

Anthony DeLeon contends:

1. *The State violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose material exculpatory evidence proving that a prior shooting at the Cardenas home and the May 9 shooting were Sureño on Sureño retaliation rather than Norteño on Sureño shootings.*

Mr. DeLeon's lawyer made a motion for *Brady* material after learning that Angelo

Lopez had recently been charged as a juvenile with a gang-related first degree assault, but

was allowed to plead to a misdemeanor. There had been two shootings on May 2—one

in Grandview and the other at the Cardenas home in Sunnyside. The State believed that

the defendants in this case had also perpetrated the May 2 shooting at the Cardenas home

because the shell casings matched and the May 9 shootings were from the same gun.

Police reports apparently indicated that the two May 2 shootings were also connected.

Defense lawyers sought discovery of all police reports and agreements as to why Mr.

69

Lopez was allowed to plead to a misdemeanor, suspecting that the Sureños were involved in both the May 2 and 9 shootings.

The State provided discovery revealing there had been a fight on May 2 in Grandview between two Sureño sects, which the defense theorized could be exculpatory.

Mr. DeLeon claims nondisclosure by the State that (1) Mr. Lopez had a prior gang-related first degree assault charge and (2) police reports of the May 2 and May 9 shootings showed that the shell casings matched and were fired from the same gun. But there is no indication in the record that the State failed to disclose any pertinent exculpatory evidence. In fact, the State sought to offer evidence that the shell casings from the two shootings at the Cardenas home matched, but the trial court agreed with defense objections that the evidence was not relevant. Mr. DeLeon cites to no *evidence* to support his theory that the May 9 shooting was Sureño retaliation.

> 2. *The trial court violated his constitutional right to present a defense when it ruled that his lawyer, in opening statement, could not refer to a Sunnyside newspaper article published shortly after May 9 that identified the three defendants as suspects.*

Mr. DeLeon sought to refer to Sunnyside and Grandview newspaper articles in opening statement as support for the theory that, because Monica Mendoza did not initially identify him as an occupant of the car, it was the articles that had led her to identify him later, thus undermining the credibility of that later identification. The court ruled there was no foundation for allowing reference to the articles in opening statement

70

because there was no evidence Ms. Mendoza ever read the articles. It ruled that admissibility issues could be revisited if evidence was presented that she read the articles. Given lack of foundation, there was no error.

3. *The trial court violated his right to be present at all critical stages, as well as his public trial rights, when it answered a jury inquiry during deliberations without escorting him to the courtroom.*

During deliberations, the jury asked to listen to Mr. Barajas's call on the 911 tape. The court and counsel agreed as to what would be played for the jury and how, and the court then answered "yes" to the jury's request. Three days later, after the jury had apparently reached a verdict, the bailiff reported that at the time he played the tape, jurors had asked him what time the Barajas call came in and he provided an erroneous answer. Upon that disclosure, Mr. DeLeon's lawyer stated that his client asked that the jury be told the correct time of the Barajas call. The lawyer also asked that the jury be told the correct time before the verdict was returned in case it would change anything in the verdict. The lawyers all agreed and the court provided the jury with written, corrective information. The bailiff later reported that the jury was aware of the discrepancy and had indicated its verdict was unchanged—apparently a reference to the 911 call.

Mr. DeLeon argues that the timing of the 911 call was critical to the jury's understanding of where the Taurus was during the shooting, that his attorney was notified of the bailiff's discrepancy but he was not, and that he had a constitutional right to influence the response to the jury and to participate in this critical stage.

71

The record is clear that Mr. DeLeon was apprised of the problem, discussed it with counsel, and that the court took the action that Mr. DeLeon requested. He was afforded the opportunity to comment upon an appropriate response, as contemplated by CrR 6.15(f). He gives no indication what his physical presence would have added to the discussion. The court's written explanation to the jury corrected the error, which was not prejudicial in any event. If any error was made in not securing Mr. DeLeon's personal presence, it was harmless beyond a reasonable doubt. *See State v. Irby*, 170 Wn.2d 874, 885, 246 P.3d 796 (2011) (violation of right to be present at trial is subject to harmless error analysis). The procedure also did not violate Mr. DeLeon's public trial right. *See State v. Sublett*, 176 Wn.2d 58, 75-77, 292 P.3d 715 (2012) (under the "experience and logic" test, in-chambers conference with counsel only to discuss a jury question seeking clarification of a jury instruction did not implicate the right to a public trial).

4. *The imposition of multiple firearm enhancements for the first degree assaults violates double jeopardy.*

Washington courts have repeatedly rejected such challenges under the coextensive federal and state double jeopardy clauses. *See, e.g., State v. Kelley*, 168 Wn.2d 72, 77-78, 83, 226 P.3d 773 (2010) (multiple firearm enhancements do not violate double

72

jeopardy when the legislature clearly intended that cumulative punishments may be imposed for the same act or conduct in the same proceeding); *State v. Aguirre*, 168 Wn.2d 350, 366-67, 229 P.3d 669 (2010) (double jeopardy not offended by weapon enhancements even when being armed with weapon is element of underlying crime).

Octavio Robledo SAG

Octavio Robledo contends:

1.      *The court abused its discretion by not bifurcating the gang aggravator.*

This contention made by Anthony DeLeon's counsel has been addressed, *supra*. There was no abuse of discretion.

2.      *A pretrial defense motion for change of venue based on pretrial publicity should have been granted. Through voir dire about gangs and otherwise, the jury pool was tainted by fear of gang retaliation, to the point that many jurors refused to serve. One prospective juror (Mr. Mow) talked about gang bangers in Yakima County having no regard for human life, implying that all gang members are all guilty.*

The record shows that the court and counsel questioned prospective juror Mow outside the presence of other jurors. He was excused for cause. The record contains no indication that Mr. Mow influenced other members of the jury pool. Mr. Robledo's claim that the jurors served under a cloud of retaliation finds no support in the record. The court did not abuse its discretion in maintaining venue in Yakima County. *See State v. Crudup*, 11 Wn. App. 583, 586, 524 P.2d 479 (1974).

3. and 4.    *The defense motion to sever the defendants for separate trials should have been granted due to the prejudicial hearsay from nontestifying codefendants in violation of Bruton, and the obtaining of the defendants' jail booking statements in violation of Miranda. He was denied effective cross-examination of nontestifying codefendants.*

These issues were raised by counsel and have been addressed, *supra*. Severance was not required when the court instructed the jury that it may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant.

5.    *Mr. Robledo raises the same Brady issue as Anthony DeLeon's SAG issue 1.*

His conclusory allegations are unsupported by any evidence.

6.    *He was denied effective assistance of counsel because his lawyer did not present the expert eyewitness testimony of Dr. Geoffrey Loftus, whom Anthony DeLeon's lawyer sought to offer as an expert on eyewitness identification and memory to support the theory that Monica Mendoza misidentified Anthony as being present in the Taurus.*

Mr. Robledo's lawyer joined in the effort to present Dr. Loftus on behalf of his client. The State opposed the Loftus testimony as unhelpful to the trier of fact because Dr. Loftus's research is not focused on acquaintance identifications (which are rarely suspect), and the proposed expert testimony was not beyond the common sense of jurors.

The court agreed with the State, but ruled that if relevant evidence was introduced at trial that Ms. Mendoza acquired post-event information potentially affecting her identification, then Dr. Loftus could testify as to whether that information could have affected her perception and memory so as to create a misidentification. The court also

74

stated that if the evidence was introduced and Dr. Loftus's testimony became relevant, it would be the defendants' obligation to procure his attendance at trial.

No new information relevant to Ms. Mendoza's identification was presented during trial. There was no cause for Mr. Robledo's counsel to call Dr. Loftus.

7. *The prosecutor committed misconduct and illegally obtained evidence (the photo of Mr. Robledo's hand showing the Huelga bird tattoo) by not filing a motion under CrR 4.7(b)(2)(iv), and instead going to a different judge and obtaining a search warrant to obtain the photo. Suppression of the photo was required.*

CrR 4.7(b)(2) provides:

Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, the court on motion of the prosecuting attorney or the defendant, may require or allow the defendant to

. . . .

(iv) pose for photographs not involving reenactment of the crime charged.

Mr. Robledo's lawyer raised this issue prior to trial, contending the photo should have been sought through the discovery process, but made no claim that the photo was invalidly obtained pursuant to the search warrant. The prosecutor argued that either avenue was proper. The court ruled the photo admissible.

The court rule affords one method of seeking inspection of evidence in defendant's possession, but does not preclude the State from using other methods such as a search warrant to obtain access to evidence. There is no showing of error or prosecutor misconduct.

8.    *The court's denial of the defense motion in limine to limit/suppress the gang evidence denied him a fair trial.*

This issue has been addressed, *supra*.

9.    *The defendants were repeatedly ambushed with late allowed evidence, violating their due process rights because they were forced to choose between speedy trial rights and having adequate investigation. The production of last minute 911 tapes forced the opening statement to be reserved.*

Anthony DeLeon's lawyer reserved his opening statement until after the State's case, but this had no effect on Mr. Robledo, whose lawyer gave his opening statement at the outset of trial. Mr. Robledo's several other citations to the record generally reflect defense objections to evidence for the State's allegedly untimely disclosure, but none of the citations support his claim of trial by ambush or being forced into a Hobson's choice.

10.    *Allowing Detective Ortiz to sit at the prosecutor's table as lead investigator/fact witness and also testify as the State's gang expert unduly enhanced his credibility thereby denying the defendants a fair trial.*

The defendants all raised this issue pretrial, contending that allowing Detective Ortiz to testify as an expert would give him unmerited credibility and destroy the legitimacy of all his testimony. They argued that any expert gang testimony should be allowed only from a nonfact witness, citing *State v. McDaniel*, 155 Wn. App. 829, 848-49, 230 P.3d 245 (2010) and *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). *McDaniel* and *Mejia* were both cases in which convictions were reversed on confrontation clause grounds after a police officer testified not only as an expert, but also

76

about, or based on, particular facts stemming from inadmissible hearsay that related to the defendants' crimes.

The trial court ruled that Detective Ortiz could testify as both a fact witness and as an expert on gang culture, but that, consistent with *McDaniel*, he could not use hearsay from other witnesses as a basis for an opinion that the defendants were involved in a gang or that they had committed these crimes. The cases do not otherwise preclude a fact witness from also testifying as an expert. Mr. Robledo does not point to any testimony by Detective Ortiz that strayed from the trial court's ruling and would be precluded by *McDaniel* and *Mejia*.

11. *Cross-examination of the State's main witness Jose Barajas was not allowed. The defendants were denied the right to confront their accuser.*

At the end of Mr. Barajas's direct examination, the defense lawyers asked to delay his cross-examination until the next morning so it could all be done together. The court instructed Mr. Barajas to return the next day and he agreed to do so. He was apparently never cross-examined. The record discloses no indication why not. There is nothing to suggest the court disallowed cross-examination of Mr. Barajas.

12. *The prosecutor committed misconduct by eliciting Detective Ortiz's expert testimony that whoever has a Huelga bird tattoo killed someone to get it.*

Detective Ortiz's testimony about the import of the Huelga bird was not misconduct by the prosecutor. The issue was otherwise raised by Mr. Robledo's lawyer and has been addressed, *supra*.

77

13. *Counsel was ineffective for not timely challenging venue for the eluding charge.*

Mr. Robledo was not charged with eluding and lacks standing to raise this issue.

14. *Ricardo DeLeon's counsel had a conflict of interest and was ineffective because he worked two days a month as a prosecutor in a municipal court.*

No conflict of interest is shown and Mr. Robledo lacks standing to raise this issue.

15. *The prosecutor committed misconduct in closing argument by making references to the severity of Mr. Cardenas's injuries that the court had excluded from evidence.*

The prosecutor described the serious bodily harm resulting from the gunshot. The argument did not go beyond the evidence presented at trial and was not misconduct.

16. *Mr. Robledo raises the same denial of right to be present issue as Anthony DeLeon's SAG issue 3. He also contends the bailiff's erroneous report to the jurors about the time that the Barajas 911 call occurred made a difference in the fact-finding process.*

As discussed above, the discrepancy was corrected, was not prejudicial, and any error in not having the defendants present was therefore harmless.

17. *Mr. Robledo raises the issue of juror misconduct for the Twitter communications and for posting something during deliberations on Facebook.*

The Twitter issue was raised by his counsel and has been addressed, *supra*. The record includes no evidence of Facebook posts by jurors during trial or deliberations; if such evidence comes to light and Mr. Robledo or the other defendants feel prejudiced, the remedy would be to file a personal restraint petition.

Nos. 29657-1-III; 29679-2-III; 29691-1-III
*State v. DeLeon*

18.    *The court improperly denied Anthony DeLeon's motion for reconsideration of the denial of a motion for a new trial as untimely.*

Mr. Robledo lacks standing to raise this issue.

_____
Siddoway, C.J.

I CONCUR:


_____
Knodell, J.P.T.

No. 29657-1-III
(consolidated with Nos. 29679-2-III; 29691-1-III)

KNODELL, J.P.T. (concurring) — I agree wholly with the majority opinion and join in its holdings. I write separately to emphasize my concern—as is illustrated by Ricardo DeLeon's substantially enhanced sentence despite scant, if any, evidence he acted with gang motivation—that Washington's sentencing statutes have come to the point of unfairly providing prosecutors with essentially unfettered discretion to seek enhanced sentences that may be wholly noncommensurate with a defendant's conduct.

Ricardo DeLeon was in the backseat of a car driving through a residential neighborhood when a young man leaving a house mistook the occupants of the car for fellow gang members. This young man, in a mistaken gesture of solidarity, flashed a gang sign at the car. Unfortunately, the car contained rival gang affiliates. In response, the driver passed by the house a second time and a passenger opened fire severely injuring another man outside the home.

One witness heard someone shouting they would shoot. But at the scene no one was able to identify the speaker. Shortly after the shooting, police found Ricardo DeLeon in the backseat. Next to him was a red bandanna. The State presented no evidence Mr. Ricardo DeLeon fired any rounds, drove the car, or did anything to help.

But under Washington law, the meager evidence the State did have was a hook upon which the State was able to hang a great deal of dirty laundry. Because the State alleged gang enhancements against all three defendants it was able to introduce expert testimony to establish a street gang enhancement and motive. One expert was allowed to testify that generally there is more than one person in the car during a drive-by shooting to act as a lookout and to provide the shooter a witness to gain credibility and respect for committing the act. Ricardo DeLeon's presence in the car almost certainly was not for this purpose because, if the State's theory was correct, until someone flashed a gang sign at the defendants, no one had planned any shooting. At the time of the shooting, Ricardo DeLeon had been in the car for some time. But he could not have gotten into the car with the intent to assist in a crime no one at that time knew was going to occur.

This state of affairs is contrary to both the vision of the drafters of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, and fundamental notions about fair trial which underlie our jurisprudence. In 1981, our legislature promulgated the SRA in order to structure sentencing in an effort to achieve proportionality and to ensure that criminals are sentenced in a manner commensurate with the punishment imposed on others committing similar offenses. RCW 9.94A.010. Since that time, our legislature has littered the code with criminal and sentencing statutes from which a prosecutor in any given case can select without any restraint from a wide variety of charges and enhancements.

2

By doing so, that prosecutor can, even with only slight proof, subject a criminal defendant to the risk of a lengthy mandatory prison term creating a grossly asymmetrical plea bargaining position which often forces a plea. The prospect of the introduction of evidence of prior misconduct by fellow gang members, people with whom the defendant may very well have never personally associated, enhances further the State's plea bargaining position and prospects for obtaining a conviction in a way that has virtually nothing to do with the proof that the person charged actually committed the crime.

This would not have been possible 30 years ago when the criminal code was simpler and the criminal justice system was not driven by unchecked prosecutorial discretion. This trend has led to outcomes both by trial and plea negotiation which are based less and less on proof and to a generally less rigorous approach to proof in the law enforcement community, which includes prosecutors.

The judicial system, like all government institutions in a democracy, can only be effective when it enjoys the confidence and trust of the people. A system which imprisons people when there is little or no proof, which employs a process of guilt determination based on anything other than proof, cannot enjoy such confidence in the long run.

So long as the courts decline to police either the legislature's power to define crimes or the prosecution's discretion to charge, in other words, so long as substantive due process has no real application to criminal law, this will continue. *See generally*

3

Nos. 29657-1-III; 29679-2-III; 29691-1-III—concurring
*State v. DeLeon*

William J. Stuntz, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE 82-83, 122-28, 209-10, 227-30 (2011). Our trial courts, with the authority they have under ER 403 to exclude unduly prejudicial evidence, should do what they can to make it as likely as possible that outcomes are based on proof. Our appellate courts should re-examine whether the radical change in the nature of our criminal code and sentencing laws requires some limit on prosecutorial discretion.

_____
Knodell, J.P.T.

No. 29657-1-III
(consolidated with Nos. 29679-2-III; 29691-1-III)

KORSMO, J. (dissenting) — Despite its protests to the contrary, the majority is applying a *per se* coercion standard to the gang status booking questions issue. That is the only conclusion that can be drawn because none of the defendants ever claimed below that they felt coerced, nor did they offer any evidence or even argument in support of such a position—and it is a position they bear the burden of proving. Their arguments are raised for the first time on appeal, but none of the appellants cite to any evidentiary support for their argument. Indeed, Anthony Deleon does not even raise the claim[1] on appeal—and it was his counsel's argument that the trial court's statement was addressing.[2]

As the party claiming coercion, the defendants bore the burden of proving its existence. *Horn v. State*, 52 Wn.2d 613, 614, 328 P.2d 159 (1958); *State v. Bird*, 31 Wn.2d 777, 781, 198 P.2d 978 (1948). They did not attempt to do so. Accordingly, the issue is not properly before this court. RAP 2.5(a)(3); *State v. McFarland*,

---

[1] Anthony DeLeon challenges the use of the jail form on several grounds including *Miranda* and multiple evidentiary bases, but he does not claim that his answer was coerced. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Tellingly, none of the defendants sought a jury instruction to put the voluntariness issue before the jury. CrR 3.5(d)(4); *State v. Smith*, 36 Wn. App. 133, 141, 672 P.2d 759 (1983).

127 Wn.2d 322, 333, 899 P.2d 1251 (1995). On that basis alone, we should not even analyze this claim.

All three defendants challenged the admission of the jail booking statements at the CrR 3.5 hearing on the basis that they were the product of custodial interrogation which needed to be preceded by fresh *Miranda* warnings. RP at 83-87, 89. Each counsel presented additional reasons for finding the questioning to be custodial. Counsel for Anthony DeLeon argued that the gang question was not a routine booking question because it called for an incriminating response and needed an independent *Miranda* warning. *Id.* at 88. Counsel for Ricardo DeLeon argued similarly and contended that this was a new interrogation that required new warnings. *Id.* at 90-91.

It was in answering this argument of counsel that the trial court made the statement that the majority now says was ambiguous in context. Majority at 29. It was not. The context was the court's discussion of the argument that the question did not meet the booking question exception because it called for an incriminating answer. The trial court rejected the prosecutor's argument that the answer was admissible independent of *Miranda* because it was a booking question, stating:

> Therefore, the statements, to the extent that they would be testimonial in that sense, that they are—the gentlemen were clearly in custody in these have been coerced statements, I don't find that they are just ordinary booking questions. They may have been treated that way previously, but they are very clearly asking questions of an individual that could clearly be evidence in the future and [*Miranda*] would be necessary before they be provided.

2

RP at 93. In context, the word "coerced"—if it even was used by the trial court in what is otherwise an ungrammatical statement—meant simply "compelled" or, more accurately, "incriminating." The court was not making a finding that asking these defendants their gang affiliation was coercive.

The lack of findings concerning any coercive aspect of the questioning also are easily understood. There were no findings because no one thought there was any coercion and did not discuss the issue. The lack of evidentiary support for the coercion claim is fatal to the majority's contention that this is not a *per se* rule.[3] No defendant said that he thought he would be protected from opposing groups only if he answered the question. There simply is no suggestion that answering the question was the quid pro quo for safe housing. Indeed, none of the defendants even suggested that they needed or desired protection from other gangs, let alone that answering the question honestly was the only way they believed they would be protected. Instead, the majority's decision is based on appellate counsel's speculation about what may have been going on inside the minds of their clients. To find coercion here, the majority would have to find it in every instance where the question of gang affiliation at booking is asked. That simply is not the rule.

---

[3] Since we review a coercion finding for substantial evidence, *State v. Reuben*, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991), the lack of evidence of coercion is fatal to appellants' claim.

3

While I do not doubt that there could be situations where asking during the jail booking process about gang or other affiliation might be coercive, there was no evidence of that presented here. In the absence of evidence, the majority can only reach its conclusion on the basis of a *per se* rule rather than its purported totality of the circumstances approach. For that reason, as well as the fact that appellants did not raise the issue below and thus failed in their burden of proof on this point, I part company with the majority in its treatment of this belatedly-raised claim.[4] I therefore respectfully dissent.

Korsmo, J.

---

[4] I join the majority and the concurrence in their respective acknowledgements that ER 403 permits the trial courts discretion to limit the quantity and nature of gang affiliation testimony. Trial courts cannot act in a vacuum, however, and therefore defense counsel must raise timely objections at trial or, perhaps more importantly, obtain some relief via motions in limine that require the gang evidence to be carefully tailored. Counsel also can avoid a great deal of testimony by stipulating, where appropriate, that a particular organization is a criminal street gang. To the extent that my learned colleague concurs on the basis of former policies of the Sentencing Reform Act (SRA), one of the short answers is that the legislature has seen fit to alter those policies over the intervening three decades as is its right as the policy-making body in our governmental structure. To the extent the concurrence believes that the prosecution has too much discretion in its charging decisions, I would simply note that nothing in the SRA alters—or could alter— the executive branch's authority to decide what charges it will or will not pursue. These are age old debates that likely will last as long as our structure of government. Changes in legislative or executive policies must come from those branches of government— whether induced by a change of heart or a change brought by the electoral process—not from the judicial branch straying outside its boundaries into the policy decisions of the other branches.