IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40152-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| AUSTIN JAMES BUTLER, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — The person who shot Angel Lopez was the father of

Jasmin Bailon's then unborn child, had access to two of Bailon's cars, and likely lived

with her. The State presented compelling evidence that this person was Austin Butler.

Butler appeals his convictions for attempted first degree murder, drive-by

shooting, and unlawful possession of a firearm in the first degree. He argues the trial

court erred by admitting the booking form that asked for and contained his mailing

address, the same address as Bailon's. He argues the arresting officer should have known

that a request for his address was reasonably likely to elicit an incriminating response.

We agree but conclude that this error is harmless beyond a reasonable doubt.

Butler also argues his constitutional right against self-incrimination was violated

by the State asking the jury to draw negative inferences from *Bailon's* silence, i.e., not

wanting to talk with the detective. We disagree. Bailon testified at trial, and the prosecutor did not comment or reference, directly or indirectly, Butler's invocation of his right to remain silent. The State was entitled to argue the reasonable inference that Bailon avoided talking to the detective so as not to implicate Butler, who she testified she loved.

We affirm.

### FACTS

*A.    The Shooting*

Angel Lopez and Jasmin Bailon were once romantically involved. Their relationship ended, and they stopped communicating with each other about one year before the shooting.

Around 1:30 a.m. on March 4, 2022, someone with access to Bailon's Facebook account began sending messages to Lopez. Lopez woke up shortly before 2:30 a.m. and responded. After a lengthy exchange of messages, Lopez agreed to meet the person, who he believed was Bailon, outside his house. At 3:38 a.m., Lopez received a text from Bailon's Facebook account reading, "Outside." Clerk's Papers (CP) at 155.

Lopez recognized Bailon's black Jeep parked on the street and walked toward it. As he approached, Lopez assumed Bailon was inside but could not tell because of the Jeep's tinted glass. As Lopez walked around to the passenger side, he saw a man he did

2

not know step out of the driver's side.  The driver walked around the front of the Jeep,

glared at Lopez, said that Bailon was pregnant with his child, and demanded that Lopez

stop talking to her.  Lopez responded that he did not know that Bailon was involved with

someone, and he then turned to walk back to his house.  The driver fired six shots at

Lopez, hitting him once in the thigh and once in the upper glute.  Lopez turned and saw

his attacker tuck the weapon away and drive off.  Lopez called 911 to report he had been

shot and to ask for medical assistance.

Police officers arrived before the ambulance.  Lopez spoke with Officer John

Oliveri and confirmed that Bailon was the owner of the black Jeep.  Officer Oliveri

obtained Bailon's address from the police database and headed to her apartment on

Browne Avenue in Yakima.

Surveillance video from a church across from Bailon's apartment showed the

activity outside Bailon's apartment around the time of the shooting.  The video showed

the black Jeep returning at 3:48 a.m., and the Jeep's driver entering Bailon's apartment.

At 3:59 a.m., the driver left in Bailon's white 1997 Toyota Camry.  Two minutes later,

Officer Oliveri arrived at the apartment and additional officers arrived soon after.

Officers confirmed that the black Jeep's hood was warm and seized it as evidence.

Officers knocked on Bailon's apartment door, but she did not answer.  The surveillance

3

video, which was later obtained, confirmed that Bailon was inside her apartment at the time the officers knocked on her door.

### B.     The Investigation

On March 4, while Lopez was recovering at the hospital, he searched Bailon's Facebook page in an effort to identify his shooter. He found posts on her page depicting Austin Butler, who Lopez identified as the shooter. Lopez called the police tip line and informed law enforcement that Austin Butler was the person who shot him. Later that day, the Facebook posts linking Bailon with Butler either became restricted from public view or were deleted from the platform. An arrest warrant was issued for Butler.

Detective Kevin Cays began investigating the case on March 7. After a couple of failed attempts to meet with Bailon, Detective Cays met her at her apartment on March 9. The detective asked Bailon if Austin was driving her Jeep the early morning hours of the shooting, and she responded, "Whose [sic] Austin." Rep. of Proc. (RP) at 1090.

### C.     The Arrest

One month after the shooting, Officer Oliveri was on patrol and stopped a white 1997 Toyota Camry for a defective brake light. Before the stop, Officer Oliveri had received an e-mail from Detective Cays to be on the lookout for Bailon's white Toyota Camry. Officer Oliveri obtained the driver's identification and learned that the driver was Butler and that the Camry belonged to Bailon. Officer Oliveri arrested Butler and

4

read him his *Miranda*[1] rights. Butler stated he understood his rights and invoked his right to remain silent. Officer Oliveri then transported Butler to the local jail for booking.

Once at the jail,[2] Officer Oliveri completed a standard booking form. One question asked for Butler's mailing address. Officer Oliveri asked Butler for his address, and Butler responded with Bailon's Browne Avenue address.

### D. Trial

The State charged Butler with attempted murder in the first degree, assault in the first degree, drive-by shooting, and unlawful possession of a firearm in the first degree. At trial, Lopez testified about the shooting, having no doubt that Butler was the person who shot him, how he identified Butler as the shooter from Bailon's Facebook page, and how someone with access to her account soon after changed its settings.

The State introduced the booking form as evidence that Butler lived at the Browne address at the time of the shooting. It also introduced the surveillance video that tied the shooter to the black Jeep, the white Toyota Camry, and Bailon's apartment. But because it was dark, the driver could not be identified in the video. Nevertheless, as discussed

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] When questioned during the motion to suppress the booking form, Officer Oliveri could not recall if he was sitting inside his car in the jail's sally port or at a desk when he asked Butler the questions. During a break in the trial, the parties learned that the officer asked Butler his address at the scene of the stop and once again inside the sally port, where, both times, his patrol car's COBAN audio/video unit recorded the pertinent portions of the conversation. The COBAN recording is not part of our record.

later, the State used several pieces of evidence to tie Butler to the black Jeep, to the white Toyota Camry, to Bailon's apartment, and to being the father of Bailon's then unborn child.

The State called Bailon and had her testify about her relationship with Butler. Bailon testified that she met Butler in early 2021. She described their relationship as an on-and-off romantic relationship. She said she loved Butler. She testified she was five months pregnant at the time of the shooting, did not know who the father was, but gave her baby the last name "Butler." RP at 942. The State, through her, offered photos found on Butler's phone, showing the couple hugging and kissing less than two days before the shooting.

The State also presented evidence that Bailon tried to protect Butler throughout the investigation. She failed to appear for her first meeting with the detective, failed to return the detective's telephone calls, and testified she did not give Butler permission to drive her black Jeep or know whether he was staying at her apartment at the time of the shooting.

The jury convicted Butler of all charges,[3] and the trial court sentenced Butler to 408 months of incarceration.

---

[3] The trial court properly vacated the assault conviction because that conviction merged into attempted murder, the greater charge.

Butler appeals to this court.

## ANALYSIS

HARMLESS ERROR ADMITTING BOOKING FORM

Butler argues the trial court erred by admitting the booking form. We agree but conclude that the error was harmless beyond a reasonable doubt.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." To counter the inherent compulsion of custodial interrogations, police must administer *Miranda* warnings. *Miranda* warnings are required when the questioning of a defendant is a custodial interrogation by an agent of the State. *State v. Sargent*, 111 Wn.2d 641, 647, 762 P.2d 1127 (1988). Once a suspect invokes his right to remain silent, the interrogation must cease. *Miranda*, 384 U.S. at 473-74.

Here, Officer Oliveri questioned Butler one month after the shooting. There is no question that Butler was in custody, was questioned by an agent of the State, and had invoked his right to remain silent. The issue is whether the booking question of Butler's address was an interrogation.

An "interrogation," for Fifth Amendment purposes,

"refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."

*Sargent*, 111 Wn.2d at 650 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)).

Generally, routine booking questions do not violate the prohibition against interrogations because such questions rarely elicit an incriminating response. *State v. DeLeon*, 185 Wn. App. 171, 199, 341 P.3d 315 (2014), *rev'd on other grounds*, 185 Wn.2d 478, 374 P.3d 95 (2016). Nevertheless, simply because booking questions typically are nonincriminating does not shield incriminating questions from *Miranda* protections. *State v. Denney*, 152 Wn. App. 665, 670, 218 P.3d 633 (2009). The focus is not on the nature of the question but whether the question was reasonably likely to elicit an incriminating response. *Id.*

This is an objective test where the subjective intent of the questioner is relevant but not conclusive. *Id.* at 671. This will turn on the particular facts of each case, and questions that "relate, even tangentially, to criminal activity" are interrogations. *United States v. Avery*, 717 F.2d 1020, 1024 (6th Cir. 1983). Courts "should carefully scrutinize the factual setting of each encounter of this type" because even a "relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a

8

particular suspect, be reasonably likely to elicit an incriminating response." *Id.* at 1025.

Even answers in response to standard booking questions are subject to Fifth Amendment

protections. *DeLeon*, 185 Wn.2d at 487.

Officer Oliveri knew, at the time he was booking Butler, that the person who

drove the black Jeep and took the white Camry in the early morning hours of March 4

was the person who shot Lopez. He knew that Bailon owned both vehicles and likely

allowed the shooter to use one or both vehicles.[4] Therefore, any fact that more closely

tied Butler to Bailon was likely to elicit an incriminating response.

During the motion to suppress the booking form, Officer Oliveri testified he had

no reason to believe Butler lived at the Browne Avenue address. Although Officer

Oliveri's purpose for asking Butler for his address is relevant, it is not dispositive.

Officer Oliveri had early responsibility for investigating this case and spoke with Lopez

before the ambulance arrived to take him to the hospital. After this, Officer Oliveri was

the first officer to arrive at Bailon's apartment. In addition, he had received an e-mail

from the detective to be on the lookout for Bailon's white Toyota Camry. Given the

nature of his involvement with the investigation, Officer Oliveri should have known that

questioning Butler about his address was reasonably likely to elicit an incriminating

---

[4] Officer Oliveri did not arrest Butler for possession of a stolen vehicle. We may infer from this that Bailon did not report the Camry as stolen.

response tying Butler to Bailon.  We conclude that the booking question in this particular

case was an interrogation and that the trial court erred by admitting the booking form.

"'[I]f trial error is of constitutional magnitude, prejudice is presumed and the

State bears the burden of proving it was harmless beyond a reasonable doubt.'"  *State v.*

*Lynch*, 178 Wn.2d 487, 494, 309 P.3d 482 (2013) (alteration in original) (quoting *State v.*

*Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013)).  Our State has adopted the

"overwhelming untainted evidence" test as the proper standard for constitutional

harmless error analysis.  *State v. Frost*, 160 Wn.2d 765, 782, 161 P.3d 361 (2007).  Under

this standard, an appellate court looks only at the untainted evidence to determine if it is

so overwhelming that it necessarily leads to a finding of guilt.  *Id.*  This requires proof

beyond a reasonable doubt that any reasonable jury would have reached the same result

in the absence of the error.  *Id.*

The State's proof of Butler's guilt was overwhelming, and included:

- The shooter identified himself as the father of Bailon's unborn child;

- Bailon was five months pregnant at the time of the shooting;

- Bailon gave the child Butler's last name;

- Bailon twice wrote to the trial court, referring to Butler as the father of the child;

10

- Butler posted a picture of himself and Bailon, saying something like, "'[T]his is my girl. She's 5 months pregnant.'" RP at 655.

- The shooter drove Bailon's black Jeep back to Bailon's apartment minutes after the shooting, went inside the apartment, and later left in Bailon's 1997 white Toyota Camry;

- A little over an hour after the 3:40 a.m. shooting, Butler did a Google search for a police scanner;

- The morning of the shooting, Butler did a Google search for Greyhound bus schedules from Yakima to Georgia;

- That afternoon, someone with access to Bailon's Facebook settings changed her settings to hide Bailon and Butler's relationship;

- Butler likely had Bailon's 1997 white Toyota Camry the day after the shooting because at 5:00 p.m. that day, Butler did a Google search for how to deactivate an alarm on a 1997 Toyota Camry;

- Butler was stopped by police one month after the shooting while driving Bailon's Toyota Camry;

- A Department of Corrections (DOC) form completed by Butler in June 2021 gave his address as Bailon's Browne Avenue address;

- Butler was required to inform his DOC officer of any change in address. January 25, 2022 was when he last met with his DOC officer, and he did not inform the officer that his address had changed from the Browne Avenue address;

- Butler's Google profile showed he and Bailon shared the Browne Avenue address for billing purposes;

- Butler's DNA was found on the Jeep's exterior driver's handle, interior door controls and handle, and steering wheel.

We conclude there is overwhelming untainted evidence of Butler's guilt, and the State has proved beyond a reasonable doubt that any reasonable jury would have reached the same result, absent admission of the booking form.[5]

---

[5] In his statement of additional grounds for review (SAG), Butler argues he received ineffective assistance of counsel due to trial counsel's failure to recall Officer Oliveri and confront him with the late-discovered COBAN recording in which Butler gave multiple addresses, not just the Browne Avenue address. The COBAN recording was not admitted at trial, is not part of our record, and we are unable to confidently measure the prejudice, if any, caused by counsel's failure to recall Officer Oliveri. Rather than rule that the error, if any, could not satisfy the ineffective assistance of counsel prejudice prong (because of overwhelming evidence of Butler's guilt), we leave the SAG issue open so Butler might file a timely personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

NO VIOLATION OF BUTLER'S RIGHT TO REMAIN SILENT

Butler argues the State violated his Fifth Amendment right to remain silent by arguing negative inferences from Bailon's unwillingness to talk with the detective, or as Butler terms it, Bailon's "silence." We disagree. As discussed below, the State neither commented on nor referred to Butler's silence, either directly or indirectly.

The Fifth Amendment prevents individuals from being "compelled in any criminal case to be a witness against himself." The Washington Constitution also states that "[n]o person shall be compelled in any criminal case to give evidence against himself." WASH. CONST. art. I, § 9. Courts interpret these two provisions equivalently. *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). "The State can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." *State v. Rupe*, 101 Wn.2d 664, 705, 683 P.2d 571 (1984).

"[T]he State may not elicit comments from witnesses or make closing arguments relating to a defendant's silence to infer guilt from such silence." *Easter*, 130 Wn.2d at 236. Testimony about the defendant's silence may be permissible for impeachment purposes after the defendant has taken the stand. *Id.* at 236-37. However, the defendant's silence may not be used as substantive evidence of guilt when the defendant has not testified. *Id.* at 236.

Courts distinguish between comments and mere references to the defendant's right to remain silent. *State v. Burke*, 163 Wn.2d 204, 216, 181 P.3d 1 (2008). Subtle and brief references do not "'naturally and necessarily'" emphasize the defendant's testimonial silence. *Id.* (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)). A comment, on the other hand, "occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996).

A comment impermissibly refers to the defendant's silence when "(1) it was the prosecutor's manifest intention to refer to the defendant's silence, or (2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *United States ex rel. Smith v. Rowe*, 618 F.2d 1204, 1210 (7th Cir. 1980) (citing *United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir. 1978)) *vacated and remanded on other grounds sub nom. Franzen v. Smith*, 449 U.S. 810, 101 S. Ct. 57, 66 L. Ed. 2d 13 (1980).

We now set forth the various comments complained of by Butler. In opening remarks, the prosecutor told the jury:

> You'll also see evidence or hear evidence that Detective Cays multiple times tried to get Ms. Bailon to make a statement. Her car was seized. Will you talk to us about that? Will you come down to the station? She missed her appointment. Never made contact.

You'll hear evidence that they went out to her apartment to contact her and she was hostile. She didn't want to give any information. She didn't want to say what she knew. When asked the question, did you let Austin drive your jeep? She said, who is Austin?

Evidence will show that later when she's interviewed she agrees that she'd been in a relationship since 2021.

RP at 87.

Later, the prosecutor asked Bailon what her reaction was to learning that her friend, Lopez, had been shot. Butler objected to the question as irrelevant, and the prosecutor answered it was relevant as to why "she would withhold information and not help law enforcement." RP at 998. The court sustained the objection and instructed the jury to disregard the prosecutor's comments.

Soon after, the deputy prosecutor asked Bailon why she would not talk to the detective and why she would not return his phone calls. She responded that she did not want to talk to the detective because he tried to trick her into talking with him.

Later, the prosecutor questioned Detective Cays about Bailon's reluctance to talk with him:

Q. . . . When somebody avoids you or doesn't give a statement, does that tend to heighten your suspicion or decrease it in a criminal investigation?
[DEFENSE COUNSEL]: Your Honor, . . .—[ER] 403.
THE COURT: So on [ER] 403 I find that the probative value outweighs the prejudicial [effect]. Go ahead.
A. Can you repeat the question?
(The Court Reporter read back the requested testimony)

15

> A. It would heighten my suspicion.
>
> Q. So when Ms. Bailon refused to talk to you, did that heighten your suspicion or decrease it regarding Mr. Butler?
>
> A. It heightened it.
>
> Q. Did you give her the opportunity to talk to you and decrease it?
>
> A. Yes.

RP at 1094-95.

Butler next focuses on an argument made by the prosecutor during closing. We first provide the context before quoting the complained-of argument.

During closing, defense counsel argued that the State did not prove beyond a reasonable doubt who drove the black Jeep and shot Lopez, and remarked that Bailon had several male friends, including relatives, who may have driven the black Jeep and shot Lopez. In response, the prosecutor argued:

> That's the problem with that argument because the one person that sat up here and knows the answer . . . and could have given it to law enforcement did not because there's only one answer that she could have given. Austin Butler.

RP at 1264. Defense counsel objected and asserted that the argument infringed on his client's right to remain silent. The court overruled the objection.

The prosecutor continued:

> What's the first thing you're going to do? You're going to say this is who was here [at the apartment immediately after the shooting]. I had nothing to do with this. That's what you do.

16

> When somebody, as Detective Cays said, is silent in the face of somebody that should be hoping to absolve themselves from participating—

RP at 1264-65. Defense counsel objected to the prosecutor's use of the word "absolving," and the court overruled the objection. RP at 1265. The prosecutor then explained:

> [Bailon] holds the keys to who was there and who had access to her car. There's only one answer. That's why she's not going to give it. Mr. Butler. Because why? We talked about the bias, motive. She loves him. Remember when she [testified.] She has lots of amnesia. . . . She's very selective in remembering. . . . Well, she remembered all those details [when defense counsel questioned her] but she can't remember, like, who was at your [apartment] the night your car is seized by law enforcement.
> . . . .
> . . . And, in fact, when asked, did you let Austin drive your jeep? Well, whose [sic] Austin? She's done everything to cover for Mr. Butler.

RP at 1264-65.

Butler argues that the above comments and argument exceed the bounds of impeachment and amount to an improper comment on *his* right to remain silent. Butler claims that a jury would naturally and necessarily take the repeated references to Bailon's silence[6] as a comment on his own silence.

To support his argument, Butler relies on *Burke*. In *Burke*, the defendant was charged with rape of a child in the third degree. 163 Wn.2d at 208. The defendant

---

[6] We note that Bailon was not "silent" about who drove her Jeep that night and stayed over at her apartment. She testified she did not remember.

17

asserted the defense that he reasonably believed the girl was 16, and, if he decided to testify, he would testify the girl "told him she was 16, about to turn 17." *Id.* If he reasonably believed the girl was 16, this would be a defense to the charge. *Id.*

The State sought to undermine the defense with evidence that the defendant, prior to his arrest, spoke to the detective but did not tell the detective about what the girl supposedly told him. *Id.* In its case in chief, the State asked the detective about an interview between the defendant and the detective. *Id.* The detective explained that the defendant's father attended the interview and, at one point, asked if his son was going to be charged. *Id.* at 208-09. The detective said it was possible. *Id.* at 209. The father then instructed his son not to make any further statements until the son spoke to an attorney. *Id.* The detective explained that the defendant soon after terminated the interview. *Id.* During cross-examination of the defendant, the prosecutor asked why he did not tell the detective that the girl told him she was 16. *Id.* The prosecutor commented on this point in closing, and the jury convicted the defendant. *Id.* The *Burke* court reversed the conviction because the State "intentionally invited the jury to infer guilt from [the defendant's] termination of his interview." *Id.* at 222.

In its decision, the *Burke* court explained that "when the defendant testifies at trial, use of prearrest silence is limited to impeachment and may not be used as substantive evidence of guilt." *Id.* at 217. Further, "[i]n circumstances where silence is protected, a

mere reference to the defendant's silence by the government is not necessarily a violation of this principle; however, when the State invites the jury to infer guilt from the invocation of the right of silence, [the United States and our state's constitutional protections against self-incrimination] are violated." *Id.* For this reason, there are different rules that apply to how the State may impeach a *defendant* who testifies and how it may impeach a *nondefendant* who testifies. In short, constitutional protections apply to the former but not to the latter.

Butler argues that *Burke* requires his conviction to be reversed. In making this argument, he takes several quotes from *Burke* out of context. In *Burke*, the defendant testified, so the *Burke* court set forth limitations on how the State could permissibly cross-examine a defendant who testifies. As noted above, these rules do not apply to how the State may permissibly cross-examine a nondefendant who testifies, such as Bailon.

This case bears no resemblance to *Burke*. There, the prosecutor impermissibly used the *defendant's* own silence as substantive evidence of the defendant's guilt. Here, the prosecutor used a *nondefendant* witness's reluctance to talk with a detective as substantive evidence of the defendant's guilt. There is no constitutional right implicated here. The Fifth Amendment protects the accused from *self*-incrimination. It does not protect the accused from being incriminated by a nondefendant witness, even if the incriminating evidence is that witness's reluctance to speak with a detective.

19

No. 40152-9-III
*State v. Butler*

Affirmed.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Murphy, J.